795 A.2d 185

Herbert H. MARTELLO

v.

**BLUE CROSS AND BLUE SHIELD
OF MARYLAND, INC., et al.**

**No. 0338, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

April 1, 2002.

464

466

John Amato, IV (Goodman, Meagher & Enoch, LLP, Baltimore, and William Kitchin, Pylesville, on the brief), for appellant.

Leonard L. Gordon (Lewis Noonberg, Michael F. Brockmeyer, Piper, Marbury, Rudnick & Wolfe LLP), Washington, DC, for appellee, Care First.

Benjamin Rosenberg (Kevin J. Pascale and Rosenberg, Proutt, Funk & Greenberg, LLP), Baltimore, for appellee, Electronic Data Systems.

Argued Before KRAUSER, CHARLES E. MOYLAN, Jr. (retired, specially assigned), ROBERT E. CAHILL, Sr. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

After more than seven years, two amended complaints, two trial court decisions on first a motion to dismiss and then a motion for summary judgment, one prior appeal to this Court, one request for and denial of certiorari to the Court of Appeals, and countless other pleadings, hearings, depositions, and proffers of evidence, all of which are packed into a Joint Record Extract of some 2,100 pages, this litigation, like Dickens's *Jarndyce v. Jarndyce,* continues to plod relentlessly on. It is perhaps a forlorn hope to believe that we can achieve a final resolution herein, but we shall at least aspire to that end.

The subject matter of the appeal is an alleged violation by the appellees of the Maryland Antitrust Act, more particularly, a violation of Maryland Code, Commercial Law Article, Sect. 11–204(a)(1) and (2). The appellant, Herbert H. Martello, is appealing a grant of summary judgment against him and in favor of the appellees, 1) Blue Cross and Blue Shield of Maryland, Inc. ("Blue Cross") and 2) the Electronic Data Systems Corporation ("EDS"), by Judge John F. Fader, II in the Circuit Court for Baltimore County.

Following an earlier dismissal of this case by Judge Fader on October 30, 1996, the appellant filed a notice of appeal on November 4, 1996. The appeal was argued before a panel of this Court on June 6, 1997. On September 23, 1997, we filed an unreported but definitive 73 page per curiam opinion, affirming in part and reversing in part with a limited remand. *Martello v. Blue Cross,* 117 Md.App. 746 (No. 1837, September Term, 1996) (*"Martello I "*). Much of the ground that we are now being asked to retraverse has been already thoroughly plowed.

## Who Are The Parties And What Do They Do?

As to who the three parties to this litigation are and as to the roles they play in the health care insurance field, we cannot improve on the incisive descriptions provided by *Mar-*

*tello I.* First as to the appellant Herbert Martello himself and his business:

> Martello, a sole proprietor, operates a clearinghouse in Maryland that furnishes electronic connectivity services to health care providers. These services include processing and electronic transmission of health care providers' bills for medical services rendered, for which payment is due from responsible health care insurers. Ordinarily, both physicians and insurers pay a fee to the clearinghouses for these services.

*Martello I,* p. 3 of slip opinion.

To try to make our opinion more intelligible, a word is in order about the term of art "electronic connectivity." It is not part of even the average lawyer's everyday vocabulary. A brief time-out is, therefore, in order before rushing forward with further discussion.

After health care providers (essentially doctors) provide medical services (essentially diagnosis and treatment) to patients, they in many, if not most, instances submit on behalf of the patients applications to health care insurers to reimburse the health care providers for all or part of the medical service that has been rendered. Involved is a massive and potentially chaotic communications problem. To facilitate that flood of communication between the health care insurers and the health care providers, clearing houses have evolved to collect the applications for payment at one end of the line, to organize them and see that they are in proper form, and then to transmit them for payment to the insurers at the other end of the line. In the trade, that collection and transmission function is called "connectivity."

As the health care insurance business developed, claims for reimbursement by the providers (e.g., the doctors) were originally submitted entirely on paper. In the 1980's, however, a transition occurred from the submission of claims on paper to the more efficient submission of such claims electronically. Hence, we have the term of art now in vogue of "electronic connectivity."

Both the appellant, Martello, and one of the appellees, EDS, are in the electronic connectivity business. They are, indeed, commercial competitors, and it is that circumstance which has given rise to this litigation.

Blue Cross, by contrast, is essentially a health care insurer. *Martello I* also described it and its basic functions:

BCBS [Blue Cross Blue Shield], a non-profit Maryland corporation, is engaged in the business of health care financing. According to Martello, BCBS is Maryland's largest health care insurer, controlling approximately 35% of the State's commercial health insurance market. BCBS is the State's sole Medicare Part A (hospital claims) contractor and, until January 1, 1995, it was the State's sole Medicare Part B (physician's claims) contractor.

In addition to providing health insurance, BCBS serves in Maryland as the third party administrator for many self-funded health insurance plans. The third party administrator market involves management of health plans for self-insured entities. According to appellant, BCBS is Maryland's largest third party administrator. Although neither Martello nor EDS competes in that market in Maryland, EDS allegedly provides third party administrator services in other states, and has the capability of entering the Maryland third party administrator market.

*Martello I*, pp. 3–4 of slip opinion.

EDS, like Martello, is a clearinghouse in the electronic connectivity business. *Martello I* described it:

EDS, a Texas corporation, competes in Maryland with Martello in the electronic connectivity market. According to appellant, EDS is the "largest and most dominant" provider of electronic connectivity services in this State.

*Martello I*, p. 4 of slip opinion.

### Martello's Complaint

In a nutshell, Martello wanted at least a respectable chunk of Blue Cross's electronic connectivity business and was aggrieved when in 1993 it all went to EDS. The nub of his

complaint is that EDS has managed to corner the market of applications for reimbursement flowing upward from multitudinous health care providers to Blue Cross as the health care insurer. *Martello I* explained how EDS came to occupy that position:

> Until 1993, BCBS provided electronic connectivity services to itself, other health insurers, and health care providers in Maryland through its wholly owned, for-profit subsidiary, LifeCard International Inc. ("LifeCard"). BCBS paid LifeCard 18¢ per electronic claim, and LifeCard secured additional revenue from other health care providers using its services; the other providers usually paid between 30¢ and 55¢ per claim. BCBS withdrew from the electronic connectivity market in 1993 when it sold LifeCard to EDS; at that time, EDS renamed the clearing house the Maryland Health Information Network ("MHIN"). According to Martello, LifeCard had controlled at least 90% of the electronic connectivity market and MHIN assumed that position in February 1993.

*Martello I,* pp. 4–5 of slip opinion.

Martello originally brought suit against both Blue Cross and EDS on September 29, 1994 in a three-count complaint, alleging 1) restraint of trade in violation of Sect. 11–204(a)(1) of the Maryland Antitrust Act, 2) both attempt and conspiracy to monopolize in violation of Sect. 11–204(a)(2) of the act, and 3) tortious interference with a business relationship, in violation of the Maryland common law. It later amended its complaint to include a charge of 4) illegal horizontal market allocation. On October 28, 1996, Judge Fader granted the motion of Blue Cross and EDS to dismiss the complaint and Martello filed his first appeal to this Court.

## The Holdings of *Martello I*

In *Martello I,* we affirmed Judge Fader's dismissal of the count charging an illegal horizontal market allocation. With respect to Count Two, alleging an unreasonable restraint of trade, we reversed the dismissal of that count and remanded for further proceedings.

We reiterate that, for purposes of a motion to dismiss, we must assume the truth of Martello's allegations. We are satisfied that appellant sufficiently pleaded a claim for restraint of trade, because he alleged, *inter alia,* that appellees acted in concert in forming an agreement to eliminate competition in the electronic claims market in which Martello competes. Whether Martello will prove what he alleges is altogether another question, for another day.

*Martello I,* p. 60 of slip opinion.

With respect to the third count that had charged Blue Cross and EDS with 1) monopoly, 2) attempted monopoly, and 3) conspiracy to monopolize, *Martello I* affirmed the dismissal with respect to both 1) monopoly and 2) attempted monopoly but vacated the dismissal as to conspiracy to monopolize on the rationale that Martello might be able to prove something other than a "conspiracy to engage in a predatory pricing scheme."

Appellant also lodged a claim for conspiracy to monopolize against BCBS and EDS. *His contentions in this regard are not limited solely to a conspiracy to engage in a predatory pricing scheme.* In reviewing the court's decision to grant a motion to dismiss, we are not concerned with whether the conspiracy is likely to succeed in enabling EDS to achieve a monopoly in the electronic connectivity market. We focus on allegations of a "conscious commitment to a common scheme designed to achieve an unlawful objective."

*Martello I,* pp. 78–79 of slip opinion.

We also vacated the dismissal of Count Four, alleging a Malicious Interference with Business Relations in Violation of the Common Law of Maryland, solely on the ground that its resolution was contingent on the resolution of other counts charging, in various ways, the unlawful restraint of trade.

[T]he parties seem to agree that the viability of count four depends upon the resolution of the appeal with respect to counts one, two, and three.

. . . .

... [C]ompetition may constitute improper interference with a prospective contractual relationship, if the competitive action is undertaken, *inter alia*, to further an unlawful restraint of trade. [*Natural Design, Inc. v.* ]*Rouse*, 302 Md. [47] at 73[, 485 A.2d 663 (1984)]. Moreover, conduct that violates the Act may, at the same time, "constitute the Maryland common law tort of malicious interference with the plaintiffs' business." *Id.* at 74, 485 A.2d 663.

*Martello I*, pp. 63–64 of slip opinion.

### Proceedings on Remand

Following the remand in the wake of *Martello I*, the appellant filed his Second Amended Complaint on June 25, 1998. Obstinately, Count One of that Second Amended Complaint recharged precisely the same Restraint of Trade by Horizontal Market Allocation in Violation of Maryland Antitrust Act, Commercial Law Article, Sect. 11–204(a)(1), that had earlier been dismissed by Judge Fader in 1996, and which dismissal had been expressly affirmed by us in *Martello I*.

In any event, on March 28, 2001, Judge Fader granted summary judgment in favor of Blue Cross and EDS on all counts and this appeal by Martello has timely followed.

### Approaching the Present Contentions

It would normally be appropriate at this point in the opinion to lis t the appellant's present five contentions. We deliberately refrain from doing so. Some of Martello's arguments are so high octane in outrage and so free-wheeling as they careen from one doctrinal lane into another as to make it almost impossible to get a firm grip on them. They badly need taming. We seem to have before us a largely undifferentiated sense of grievance searching for a supportive legal theory.

To help clear our field of vision, we find it convenient to dispose of, preliminarily, several of Martello's more peripheral contentions. This will at least eliminate some of the clutter

before we undertake to zero in on the core contentions that allege violations of the Maryland Antitrust Act.

## Horizontal Allocation of the Market
## And the Law of the Case

The fifth and final of the appellant's contentions is that "this Court erred in *Martello I* when it denied Martello standing in the *per se* product market allocation count." We are being asked to revisit an issue we thought we had resolved in *Martello I.* Mercifully, it is not necessary for us to do so.

■ Quite aside from showing incredible hubris, this remarkable contention ignores the law of the case doctrine. As stated in *Fidelity–Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 372, 142 A.2d 796 (1958): "Once this Court has ruled upon a question properly presented on an appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, as aforesaid, such a ruling becomes the 'law of the case,' and is binding on the litigants and courts alike, unless changed or modified after reargument, and *neither the questions decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal.*" (Emphasis supplied). That doctrine applies, of course, whether the law of the case has been announced by the Court of Appeals or by this Court. *Kline v. Kline,* 93 Md.App. 696, 700, 614 A.2d 984 (1992); *Roane v. Washington County Hospital,* 137 Md.App. 582, 587–88, 769 A.2d 263 (2001).

■ Although the court that originally announces what then becomes the law of the case may no doubt, *sua sponte,* later rethink its earlier position, the appellant is not legally entitled to such a reconsideration. The correctness of what we said in *Martello I,* moreover, is not the issue before us. The appeal, by its very nature, alleges that it was Judge Fader who was in error in not reconsidering the position taken on this issue by *Martello I.* That, of course, was not his

prerogative. Commendably, he followed the dictates of *Martello I* and that cannot be error on the part of the trial judge.

Quite aside from the preclusive effect of the law of the case doctrine, we reaffirm, even if redundantly, that what we earlier said in *Martello I* is still eminently correct.

> It is evident, however, that Martello does not complain about a horizontal allocation of territorial markets. Rather, he asserts that the parties have allocated product markets, by which they agreed to give the electronic claims market to EDS and the third party administration market to BCBS. None of the cases cited by appellant concerns horizontal allocation of products. Assuming that a claim of horizontal market allocation may be based on the division of products, and not merely territories, we nonetheless agree with the trial court that Martello's allocation claim falls short of the mark.

*Martello I,* pp. 25–26 of slip opinion (emphasis supplied).

 *Martello I* held further that the appellant, as a non-consumer, had no standing to raise the claim.

> *We are equally convinced that Martello has not stated a claim based on horizontal market allocation,* because he has failed to set forth a factual basis to support a claim of antitrust injury. To be sure, the division of product markets between BCBS and EDS necessarily reduced the number of Martello's competitors in the electronic connectivity market; absent the Agreement, Martello would have faced competition from both EDS and BCBS. But it is unlikely that Martello suffered an antitrust injury based on conduct that may have reduced the number of his competitors. Moreover, *because he is not a consumer in the electronic connectivity market, he also is not injured by any increase in prices stemming from the elimination of BCBS as a competitor.* On the contrary, he would benefit from an increase in prices flowing from a reduction in competition. Nor does he compete in the third party administrator market allegedly allocated to BCBS.

*Martello I*, pp. 36–37 of slip opinion (emphasis supplied). See also *Quality Discount Tires v. Firestone Tire & Rubber Co.*, 282 Md. 7, 23, 382 A.2d 867 (1978); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We hereby reaffirm our bottom line conclusion on this issue at page 40 of the slip opinion.

> *Because Martello was not harmed by the horizontal market division, the trial court properly dismissed the restraint of trade claim in count one.*

(Emphasis supplied).

### A Contingent Claim: Tortious Interference With a Business Relationship

Martello's fourth and penultimate contention can also be readily disposed of. Both in his pre-*Martello I* original complaint and his post-*Martello I* Second Amended Complaint, Martello claimed that Blue Cross and EDS had maliciously interfered with his business relations in violation of the common law of Maryland. In dismissing the entire complaint in 1996, Judge Fader necessarily dismissed this count. The propriety of that dismissal was one of the issues before us in *Martello I.*

We there cited *Natural Design, Inc. v. Rouse*, 302 Md. 47, 69, 485 A.2d 663 (1984), for the proposition that where the tort of interference with a business relationship does not consist of inducing the breach of an existing contract by one of the contracting parties to the detriment of the other contracting party, it requires that the tortfeasor "maliciously or wrongfully interfere with economic relationships in the absence of a breach of contract." When the tort is of that latter type, *Rouse*, quoting from *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962 (1909), explained that it consists of the following elements:

> " '(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss,

without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.' "

302 Md. at 71, 485 A.2d 663.

The key element for our purposes in *Martello I* was the third, "which constitutes malice." In *Rouse*, Judge Eldridge pointed out that "legal malice means 'a wrongful act done intentionally without just cause or excuse' " and that "an act has been deemed malicious if it is unlawful." 302 Md. at 71, 485 A.2d 663.

■ The mere fact that Martello might have suffered from EDS's aggressive business tactics would not be enough to constitute the tort. As Judge Eldridge in *Rouse* further pointed out:

One recognized ground of "just cause" for damaging another in his business is competition. As this Court noted in *Goldman v. [Harford Road] Building Assn., supra,* 150 Md. [677] at 684, 133 A. 843 [1926]:

" 'Iron sharpeneth iron' is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwithstanding competition is not altruistic but is fundamentally the play of interest against interest, and so involves the interference of the successful competitor with the interest of his unsuccessful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong."

302 Md. at 72–73, 485 A.2d 663.

The only unlawful act alleged by Martello to satisfy the malice requirement was his claim that Blue Cross and EDS had engaged in an unlawful combination to restrain trade. The Court of Appeals in *Rouse* had held that such an unlawful restraint of trade, if established, would satisfy the malice requirement of the common law tort.

We agree that the defendants' acts, if proven to be part of a price-fixing combination in violation of the Maryland Antitrust Act, would also constitute the Maryland common law tort of malicious interference with the plaintiffs' business. Under these circumstances, the acts would be unlawful and thus improper.

302 Md. at 74, 485 A.2d 663.

Because we also held in *Martello I* that two counts charging a restraint of trade were still viable, the common law tort which could be predicated upon them was *ipso facto* also still viable.

Because count four is based on the same conduct of which Martello complains in counts two and three, Martello has alleged all the elements as articulated in *Willner [v. Silverman,* 109 Md. at 355, 71 A. 962]. As we have determined that Martello may go forward on count two, and that dismissal without prejudice is appropriate with respect to certain claims in count three, we shall also reverse the dismissal of count four.

*Martello I,* p. 64 of slip opinion.

It was clear that the viability of this fourth count was contingent on the viability of the other counts claiming the unlawful restraint of trade. It had no other predicate on which to stand.

[T]he parties seem to agree that the viability of count four depends upon the resolution of the appeal with respect to counts one, two, and three.

*Martello I,* p. 63 of slip opinion.

Because we have already held that the count charging a horizontal allocation of the market was properly dismissed and because we are further holding, for reasons yet to be discussed, that all other counts charging an unlawful restraint of trade were inadequate to withstand summary judgment against them, it follows that the count charging the common law tort of interference with a business relationship similarly cannot withstand an adverse summary judgment.

The viability of that count was dependent on a contingency and the contingency never came to pass. The count, therefore, was in the last analysis supported by nothing.

## The Remaining Contentions

The remaining three contentions engage the gears of the Maryland Antitrust Act. Those contentions are:

1. that the circuit court erred when it rejected as a matter of law Martello's alternative and non-traditional recoupment theory;

2. that the circuit court erred when it rejected as a matter of law Martello's claim of a conspiracy between Blue Cross and EDS to restrain trade because of his failure to prove traditional recoupment; and

3. that the circuit court erred when it disregarded this Court's holding in *Martello I* that Martello need not prove recoupment in his conspiracy claim against BCBS and EDS.

## The Maryland Antitrust Act

In seeking to pinpoint some unlawful act on the part of Blue Cross and EDS, Martello has invoked two provisions of the Maryland Antitrust Act. The Maryland Act is a product of ch. 357 of the Acts of 1972. As its statement of purpose makes clear, it is modeled on the federal Sherman Antitrust Act of July 2, 1890 (26 U.S. Stat. 209, 15 U.S.C. Sects. 1 through 7) and subsequent amendments to that act. Maryland Code Annotated, Commercial Law Article, Sect. 11–202(a)(1) and (2) makes it very clear that for our intrastate purposes we look to the federal interstate analogue for guidance.

(a) *Purpose, interpretation, and construction.*—(1) The General Assembly of Maryland declares that the purpose of this subtitle is to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest intrastate competition.

(2) It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters, including [the Sherman Antitrust Act of 1890 and subsequent amendments to that act.]

Martello relies on two provisions of the Maryland Antitrust Act. The first is Sect. 11–204(a)(1), which provides:

(a) *Prohibited conduct.*—A person may not:

(1) By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce.

That provision is essentially the same as Sect. 1 of the Sherman Act. *Cavalier Mobile Homes Inc. v. Liberty Homes Inc.*, 53 Md.App. 379, 384–85, 454 A.2d 367 (1983); *Greenbelt Homes Inc. v. Nyman Realty Inc.*, 48 Md.App. 42, 48, 426 A.2d 394 (1981).

The second provision relied on is Sect. 11–204(a)(2), which provides:

(a) *Prohibited conduct.*—A person may not:

(2) Monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

That provision is essentially the same as Sect. 2 of the Sherman Act. *Natural Design Inc. v. Rouse*, 302 Md. 47, 53–60, 485 A.2d 663 (1984).

## The Acts Complained Of

Martello's fundamental problem is that of making any of the acts he complains of fit into the mold of anything forbidden by the Maryland Antitrust Act. In *Martello I,* slip opinion at p. 1, we summarized the factual substance of the complaint.

In his suit, Martello asserted that BCBS agreed to pay EDS an inflated amount for each electronic claim processed by EDS. Martello further alleged that BCBS's payments

constituted the *quid pro quo* for EDS's agreement not to compete with BCBS. Moreover, he contended that BCBS's excessive payments were used by EDS to finance a predatory pricing scheme by which EDS offered electronic connectivity services to health care providers, without charge, for claims transmitted to BCBS. In this so called "zero-price campaign", EDS electronically sent to BCBS for payment the bills generated by the health care providers for services they rendered to BCBS's insureds.

As we flesh out the complaint in a bit more detail, it behooves us to remember that the only market we are concerned with for antitrust purposes is the electronic connectivity market. Blue Cross is a health care insurer, a business for which Martello does not compete. Since 1993, Blue Cross has not been in the electronic connectivity business. It is hard to see how any action of Blue Cross, as a customer of the electronic connectivity providers, has any pertinence to an alleged antitrust law violation. Our focus must be on EDS and on the likely impact that its actions will have 1) first on EDS's competitors in the electronic connectivity market and 2) then on the customers for electronic connectivity services.

Prior to 1993, Blue Cross handled its own connectivity activities through its wholly owned subsidiary LifeCard International, Inc., which received an average payment of 16¢ per claim from Blue Cross plus an unspecified sum per claim from the various health care providers. In 1993 LifeCard was sold to EDS. As part of a ten year agreement between Blue Cross and EDS, EDS became the electronic connectivity provider for Blue Cross and would be paid for that, and related services, at a rate of 65¢ per claim.

EDS also agreed not to compete with Blue Cross in Maryland in the third party administrative market. Martello's incendiary allegation that Blue Cross's "inflated" payments of 65¢ per claim to EDS were actually a "bribe" for EDS not to compete in that field is the charge of a circumstance that is extraneous to our analysis. If EDS's action does not, in and of itself, constitute an antitrust law violation, it matters not

that Blue Cross, for whatever reason, aided and abetted in an unoffending action.

EDS also agreed not to require any payments from the health care providers themselves. According to the evidence presented to Judge Fader, this arrangement was part of a trend going on throughout Maryland and nationwide whereby the health care insurers began picking up all of the costs for electronic connectivity services. This transfer of costs was in part to encourage smaller health care providers, hesitant to incur an additional expense themselves, to switch from submitting claims on paper to submitting them electronically. The new cost arrangement is now essentially universal in the electronic connectivity business.

The gist of Martello's complaint, as a factual matter, is that Blue Cross, an electronic connectivity customer, was paying EDS far more per claim than the service was worth and that EDS, in turn, no longer charged the health care providers anything for the electronic connectivity service. Martello's problem is how to make an antitrust case out of that.

## Whom Do Antitrust Laws Seek to Protect?

Because the subject matter of this case is not daily grist for the Maryland appellate mill, it behooves us 1) carefully to get our own bearings and 2) then to identify, as best we can, those bearings for the benefit of the reader. Martello is alleging and is attempting to prove that Blue Cross and EDS violated Maryland antitrust law. He relies on Sect. 11–204(a)(1) and (2) of the Commercial Law Article, enacted by Sect. 3 of ch. 49 of the Acts of 1975.

Those two closely related subsections, but for substituting intrastate commerce for interstate commerce, track almost precisely Sects. 1 and 2 of the federal Sherman Antitrust Act of July 2, 1890 (ch. 647), as amended by the Clayton Act of October 15, 1914 (ch. 323) and the Robinson–Patman Act of August 17, 1937 (ch. 690). On a number of occasions the Supreme Court of the United States has stated precisely what actions and consequences Sects. 1 and 2 of the Sherman Act

were designed to prevent and has laid out emphatically the required elements that must be proved to establish a violation of those antitrust law provisions.

As we look to the Supreme Court cases for guidance, our problem in attempting to get a firm handle on Martello's remaining contentions is that they do not even seem to be in the right church, let alone in the right pew. At the most basic level, Martello is aggrieved that he was unable to compete more effectively with EDS for Blue Cross's electronic connectivity business. He does not even mention competing with EDS for electronic connectivity business with numerous customers other than Blue Cross. Martello complains that EDS, allegedly aided and abetted by Blue Cross, enjoyed unfair competitive advantages over him. Martello's problem is that he cannot confect out of his general sense of grievance anything that resembles an antitrust violation.

 It is clear that antitrust laws are designed not to protect an individual competitor, such as Martello, but only to protect competition itself, so that a non-competitive monopoly may not with impunity raise prices to the ultimate detriment of the consuming market. The general statement of purpose of antitrust legislation was succinctly articulated by *Brooke Group v. Brown and Williamson,* 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

> That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the *antitrust laws were passed for "the protection of competition, not competitors." Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

(Emphasis supplied).

*Cargill, Inc. v. Monfort of Colorado,* 479 U.S. 104, 116, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), emphasized that antitrust laws are not intended to protect individual competitors.

> To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to

increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition."

■ *Brooke Group v. Brown and Williamson,* 509 U.S. at 225, 113 S.Ct. 2578, made it clear that it is only the "dangerous probability" of monopoly that the antitrust laws guard against.

[I]t [is] not enough to inquire "whether the defendant has engaged in 'unfair' or 'predatory' tactics"; rather, *we insisted that the plaintiff prove "a dangerous probability that [the defendant] would monopolize a particular market."*

(Emphasis supplied).

The Supreme Court went on, 509 U.S. at 225, 113 S.Ct. 2578, to stress that antitrust law is not a shield against unfair competition.

"Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; *those laws do not create a federal law of unfair competition* or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'"

(Emphasis supplied).

### Predatory Pricing, Monopolization, And Recoupment

The evil that the antitrust laws guard against is one that emerges in three successive stages. The first stage occurs in a theretofore competitive market when an avaricious competitor, with deep financial resources, engages in predatory pricing, to wit, it sustains for some extended period of time a calculated loss by charging inordinately low prices below the cost of doing business so as to drive less well financed competitors totally out of the field.

The second stage is realized when the predatory pricer, having driven the competition from the field, enjoys monopoly or near-monopoly status and is thereby in a position to dominate the field and its pricing structure.

The third stage follows immediately from the second. The predatory pricer, now enjoying monopoly status, sets out to recoup its earlier investment, to wit, the calculated losses it sustained, by charging supra-competitive high prices to a market helpless to find alternative sources for the desired and needed product.

■ Although the three stages are closely related, the focus in given cases may sometimes be on one and sometimes on another. The burden is on a plaintiff alleging an antitrust violation to establish each of these three elements: 1) predatory, below cost, pricing in the first instance; 2) as a consequence, a dangerous probability that the predatory pricer will achieve monopoly status; and 3) the probability that that monopoly status will be maintained long enough for the predatory pricer to achieve a financial recoupment of its earlier investment.

Martello's case was fatally inadequate in all three regards. Although the discussion both before Judge Fader and before this Court in *Martello I* and in the present appeal has been phrased largely in the language of "recoupment," that recoupment discussion has been broad enough to engage the gears of all three stages of an alleged antitrust law violation.

### Predatory Pricing

*Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), described predatory pricing.

Throughout this opinion, we refer to the asserted conspiracy as one to price "predatorily." This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in.... In such cases, "predatory pricing" means pricing below some appropriate measure of cost.

In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117–18, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), Justice Brennan addressed the same phenomenon.

> *Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run.* It is a practice that harms both competitors *and* competition. In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition. Predatory pricing is thus a practice "inimical to the purposes of [the antitrust] laws."

(Emphasis supplied).

The alleged predator, in the case before us, EDS, must be charging a price that is below his cost of doing business, to wit, he must be sustaining a deliberate and calculated financial loss by charging a low price that his competitors cannot afford to match. *Brooke Group Ltd. v. Brown and Williamson,* 509 U.S. 209, 222–23, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), spoke to this requirement.

> *[A] plaintiff* seeking to establish competitive injury resulting from a rival's low prices *must prove that the prices complained of are below an appropriate measure of its rival's costs.* ... [T]he reasoning in both [*Cargill Inc. v. Monfort of Colorado and Matsushita Elec. Ind. Co. v. Zenith Radio* ] suggests that *only below-cost prices should suffice,* and we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. . . ." As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits.

(Emphasis supplied).

■ The immediately apparent and fatal flaw in Martello's allegation of an antitrust violation is that there was no preda-

tory pricing in this case. As we assess the competitive nature of Maryland's electronic connectivity market, the price that concerns us is the unit price for each "connection," that is, the price per transmittal of a claim for reimbursement from a health care provider to a health care insurer. It is the price charged by an electronic connectivity provider, such as EDS, to the customers who are then placed in communication with each other.

It is a price that may be charged to 1) the customers at the receiving end of the transmission, health care insurers such as Blue Cross; 2) the customers at the sending end of the transmission, the health care providers; or 3) the customers at both ends of the transmission in some cost-sharing combination. As we look at the ability of electronic connectivity providers to compete with each other, it does not matter who pays their price. It only matters what price they are charging. Our concern is with the price charged by EDS, to somebody, for each such transmittal or connection so that we may compare EDS's price with EDS's cost.

At the time pertinent to this review, the price charged by EDS was 65¢ per electronic claim. The price was paid exclusively by Blue Cross, so that the health care providers were not required to pay anything for transmitting their claims. The evidence proffered before Judge Fader indicated that this was part of a statewide and, indeed, nationwide trend for health care insurers, as bigger business institutions, to assume the total cost of such electronic connectivity service. One reason for the assumption of costs by the insurers was to encourage the submission of claims electronically, a modality that is more cost efficient from the health insurers' point of view.

A price of 65¢ per electronic claim is a high price, not a low price. It is almost four times as high as the 18¢ per electronic claim Blue Cross earlier paid to LifeCard, its wholly owned subsidiary. It is twice as high as the 32¢ per electronic claim Blue Cross is now paying EDS pursuant to a new and successor contract. Martello made no offer of proof with

respect to the range of prices being charged for transmitting each electronic claim by EDS's numerous competitors in the Maryland electronic connectivity market.

Martello, in paragraph 26 of his Second Amended Complaint, acknowledges that a price of 65¢ per electronic claim is a very high price and is, in fact, "more than double the usual market rate."

BCBSM further agreed to pay EDS a minimum of $0.65 per claim for each electronic claim (Medicare and private BCBSM commercial) submitted to BCBSM by EDS even though *that price is more than double the usual market rate for a processed electronic claim.*

(Emphasis supplied).

At a price of 65¢ per electronic claim, EDS was making a handsome profit, not sustaining a calculated loss. A price that is "too high" rather than "too low," by definition, cannot be a predatory price. EDS never charged a "below cost" price. It never undercut less well financed competitors by charging a predatorily low price that they could not hope to match. In the last analysis, there was no predatory pricing. Martello's sense of grievance, still very illusory to us, simply does not fit into the antitrust violation mold.

In an effort to make something out of nothing, Martello seeks to focus on one of the potential paying customers to the total exclusion of the other. He claims that the handsome price paid by Blue Cross for each electronic claim made it possible for EDS to charge the health care providers nothing and that "nothing" is *ipso facto* a low cost. A free electronic connectivity service is, indeed, very attractive to health care providers. What attracts them, however, is not the low price being charged for the service but the fact that another customer of the service is picking up the entire bill.

Martello's argument overlooks the strong trend in the electronic connectivity industry generally to relieve health care providers of all transmittal costs and also overlooks the fact that most, if not all, of EDS's competitors in the industry are doing the same thing in this regard that EDS is doing. It is

this allocation of the price, rather than the price itself, to which Martello objects.

Relieving the health care providers of all electronic connectivity costs and allocating the entire cost to the health care insurers is, however, a factor not necessarily dependent on the price itself. The reallocation of the billing to the medical insurers exclusively could occur at a price of 55¢ per electronic claim or 35¢ per electronic claim as surely as it did at a price of 65¢ per electronic claim. It appears that even at the newly contracted cost of 32¢ per electronic claim, Blue Cross is still assuming all of the electronic connectivity costs. There is no indication that the numerous health care insurers other than Blue Cross are not now also assuming all of the electronic connectivity costs even when they are being charged a lower price per electronic claim than that charged by EDS to Blue Cross. This reallocation of the price charged from one category of customers to another is a false trail and does not constitute a case of predatory pricing.

Martello's skewed focus on the reallocation of costs from one class of customers to another ignores the overarching reality that, in the electronic connectivity marketplace, the competing clearinghouses must offer prices that are attractive to the health care insurers, the Blue Crosses of this world, as much or even more than they must offer attractive prices to health care providers. As an abstract proposition, why would an inflated price attract a customer such as Blue Cross or any other health care insurer? Even if some other lure could give rise to some other complaint, it would not be a case of predatory pricing. At a price of 65¢ per electronic claim, EDS posed no danger of monopolizing the electronic connectivity business of Maryland's health care insurers, of whom Blue Cross is only one. Indeed, it could not even continue to hold Blue Cross at that price. *A fortiori*, EDS did not threaten, with its pricing policy, to drive numerous other electronic connectivity providers out of business.

In terms of predatory pricing, we fully understand and share the quandary expressed by Judge Fader in his Memorandum Opinion and Judgment of March 26, 2001.

Blue Cross has selected an exclusive entity to process its claims. It absorbs the cost as the price of doing business, and thus does business the way it wants to do business. *Even if Blue Cross and EDS had a deal to exchange this exclusive right to process claims for the promise of EDS to stay out of the third party administrator market, how that is exactly concerned with the predatory pricing law is of some concern to me?*

My attempts to unravel the development of predatory pricing schemes and the legislation enacted to combat wrongs so as to allow me to better understand why or why not the Blue Cross & EDS agreement, if proven to exist, would violate the law, has not been successful. I can only abandon the effort saying that *the alleged agreement at hand sounds like a different type of arrangement than those that have concerned courts in the past where predatory price fixing schemes have been found to exist.*

(Emphasis supplied).

As part of the law of the case, we announced in *Martello I,* slip opinion at pp. 49–50, that "[i]t is clear that 'only below-cost prices can be considered predatory.'" In *Martello I,* we also quoted with approval from *Atlantic Richfield Co. v. USA Petroleum,* 495 U.S. 328, 340, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), wherein the Supreme Court stated:

[S]o long as [the prices] are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Martello I,* p. 33 of slip opinion.

Although the language of the ultimate grant of summary judgment focused on the absence of any chance of, or even effort at, recoupment, the absence of any predatory pricing was nonetheless an ineradicable part of the rationale. Predatory pricing, monopoly market power, and recoupment are but aspects of the indivisible phenomenon that is the antitrust violation. A flaw in any of its parts is fatal to the whole.

## The Dangerous Probability of Monopoly

We turn now to an examination of a second aspect of this indivisible phenomenon. Even if, arguendo, predatory pricing had been established, however, that alone would not establish a violation of the antitrust law. Antitrust law only becomes concerned when the predatory pricing creates a "dangerous probability" that the predatory pricer will thereby achieve monopoly or near-monopoly status. There was no allegation, let alone proffered evidence, of the serious threat of monopoly in this case.

In *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the defendants were charged with having violated Sects. 1 and 2 of the Sherman Antitrust Act, just as the defendants-appellees here were charged with violating the analogous Sects. 11–204(a)1 and 2 of the Maryland Antitrust Act. The Supreme Court pointed out that a predatory pricing scheme only constitutes an antitrust violation when there is a substantial likelihood that it will achieve and then maintain for the predators a monopoly status. The opinion further pointed out how difficult it is for an antitrust plaintiff to satisfy such a burden of proof.

[T]he success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, *it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain.* Absent some assurance that the hoped-for monopoly will materialize *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U Chi L Rev 263, 268 (1981). For this reason, *there is a consensus among commentators that*

*predatory pricing schemes are rarely tried, and even more rarely successful.*

475 U.S. at 589, 106 S.Ct. 1348 (emphasis supplied).

The Supreme Court summed up its holding, 475 U.S. at 590–91, 106 S.Ct. 1348:

> [I]f predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, *petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices.*

(Emphasis supplied).

In *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court focused on a predatory pricer's projected market power as an important aspect of the likelihood that monopoly status could be achieved and then maintained.

> In order to succeed in a sustained campaign of predatory pricing, *a predator must be able to absorb the market shares of its rivals once prices have been cut. If it cannot do so, its attempt at predation will presumably fail,* because there will remain in the market sufficient demand for the competitors' goods at a higher price, and the competitors will not be driven out of business. In this case, Excel's 21% market share after the merger suggests it would lack sufficient market power to engage in predatory pricing. See Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale LJ 284, 292 (1977) (*60% share necessary* ); Areeda & Turner, Williamson on Predatory Pricing, 87 Yale LJ 1337, 1348 (1978) (*60% share not enough* ).

479 U.S. at 119, n. 15, 107 S.Ct. 484 (emphasis supplied). Even if EDS were in a position to control all of Blue Cross's business and to maintain that control for an indefinite period, Blue Cross's business only represented, even according to Martello, 35% of the health care insurer market.

In *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455–56, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), the Supreme Court reiterated that an examination of probable market power is indispensable to assessing the probability of achieving monopoly status.

> *"[T]he plaintiff* charging attempted monopolization *must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power* .... [W]ithout a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."

(Emphasis supplied).

In the case before us, Martello offered nothing with respect to the Maryland electronic connectivity market as a whole. He did not focus on EDS's projected market power within that industry. Martello, in effect, was content to redefine the "market" as not Maryland's electronic connectivity business generally but as Blue Cross's share of that business exclusively. He, in effect, redefined "monopoly" not as a monopoly of the statewide business but narrowly as a monopoly of Blue Cross's business.

Several exhibits and depositions that were before Judge Fader revealed 1) that Blue Cross is far from being everything there is to the consumer market of medical insurers and 2) that EDS is far from being everything there is to the electronic connectivity provider industry. In terms of connectivity providers, EDS and five other companies are certified by the Maryland Electronic Health Networks. Martello chose not to seek certification and is not one of them. One of the exhibits submitted to Judge Fader was an Expert Report by Barry C. Harris, the former chief economist for the Antitrust Division of the U.S. Department of Justice. His report, factually not in dispute in this regard, showed that in 1997, four years after the agreement between EDS and Blue Cross on which Martello bases his case, "EDS's share of total electronic claims submitted by Maryland health care providers was approximately 27%."

In terms of consumers, even according to Martello's allegations, Blue Cross represents only 35% of the health insurance market. Martello blithely ignores the other 65% of the market as if it had no role to play in an analysis of any "dangerous probability" that EDS was going to monopolize that market. The Maryland Health Care Access and Cost Commission has directed all payers with health care premiums of one million dollars or more to designate at least one certified network for accepting electronic claims. Of the sixty-three insurers with over one million dollars in Maryland health care premiums, only twelve chose EDS as its designated Electronic Health Network. Fifty-one insurers designated some other clearinghouse.

Martello never undertook to allege, let alone to proffer evidence to show, how anything that EDS may have done with Blue Cross had any adverse impact on Martello's ability to compete for the business of any of the numerous health care insurers in Maryland other than Blue Cross. Instead of looking at the market as a whole, which antitrust analysis requires, Martello looked myopically only at that fraction of the market represented by Blue Cross.

■ As *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), made clear, an analysis of likely impact on the total market cannot be ignored.

In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.

With the same narcissistic focus on himself as a competitor rather than on competition generally, Martello never undertook to allege, let alone to proffer evidence to show, how anything that EDS may have done with Blue Cross had had any adverse effect on the numerous large and small electronic connectivity providers other than himself. We reiterate the prime direction from *Brooke Group v. Brown and Williamson*, 509 U.S. at 224, 113 S.Ct. 2578, that "the antitrust laws

were passed for 'the protection of competition, not competitors.' "

Martello failed utterly to show what *Brooke Group Ltd. v. Brown and Williamson*, 509 U.S. at 226, 113 S.Ct. 2578, described as "real market injury."

> *These prerequisites to recovery* are not easy to establish, but they are not artificial obstacles to recovery; rather, they *are essential components of real market injury.*

(Emphasis supplied).

In *Martello I* this Court made it clear that the "dangerous probability of achieving monopoly power" and the required consideration of "the relevant market and market power" are indispensable factors in the assessment of an antitrust claim.

> *An attempted monopolization claim requires the antitrust plaintiff to show* "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) *a dangerous probability of achieving monopoly power."* *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456[, 113 S.Ct. 884, 122 L.Ed.2d 247] (1993). In analyzing the third component—dangerous probability of monopolization—*the relevant market and market power must be considered.*

*Martello I,* p. 43 of slip opinion (emphasis supplied).

Once again, although the language explaining the grant of summary judgment focused on the aspect of recoupment, the total absence of any "dangerous probability" of EDS's becoming a monopoly was just as fatal to the proof of the recoupment requirement as it was to proof of the antitrust enterprise as a whole. Without monopoly power behind it, recoupment cannot work.

### The Likelihood of Ultimate Recoupment

Even the combination of 1) predatory below-cost pricing and 2) a consequential monopoly of the market as a result of driving all or most of the competitors out of the business does not constitute an antitrust violation unless there is also the likelihood that the predator will be able to maintain

the monopoly for a long enough time to recoup the earlier losses from below-cost pricing by successfully charging supra-competitive (higher) prices. It is the ultimate gouging of the monopolized market with supracompetitive prices that is the evil which the antitrust laws seek to prevent. Indeed, but for the fear of recoupment, predatory pricing is considered a blessing. As *Brooke Group Ltd. v. Brown and Williamson,* 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), points out, "Without [recoupment], predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced."

*Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), discussed this expectation of recoupment and the "long shot" nature of the gamble that it involves.

A predatory pricing conspiracy is by nature speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational the conspirators must have reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

"Any realistic theory of predation recognizes that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in the future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of the losses." R. Bork, The Antitrust Paradox, 145 (1978).

*Matsushita* went on to point out why a conspiracy between several predators is particularly difficult to prove.

[P]redatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover the gains depend on a host of uncertainties, making such schemes more likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. See Easterbrook, The Limits of Antitrust, 63 Texas L Rev 1, 26 (1984).

475 U.S. at 594–95, 106 S.Ct. 1348.

*Brooke Group v. Brown and Williamson,* 509 U.S. at 224, 113 S.Ct. 2578, emphasized the requirement that there be a "reasonable expectation" of recoupment.

The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices. "For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." *Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation.*

(Emphasis supplied).

The Supreme Court went on to discuss the burden of proof and its allocation with respect to recoupment.

*The plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation,* including the time value of the money invested in it. As we have observed on a prior occasion, "[i]n order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."

... Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market.

509 U.S. at 225–26, 113 S.Ct. 2578 (emphasis supplied).

It is now, moreover, the law of this case that the likelihood of recoupment is a necessary element of this case.

We are amply satisfied that *recoupment is,* indeed, *an element of a predatory pricing claim,* and that it was not sufficiently pleaded in the amended complaint....

... *[P]redatory pricing requires* 1) pricing below an appropriate measure of cost and 2) *a likelihood of subsequent recoupment of the investment by means of post-predation, supracompetitive prices and profits.* In essence, this means that once the predator has succeeded in eliminating competition, it recovers its earlier losses by raising prices.

*Martello I,* p. 49 of slip opinion (emphasis supplied).

### Martello's Concession As to Traditional Recoupment

Except for his strained theory of simultaneous (as opposed to future) recoupment, yet to be discussed by us, Martello has virtually conceded this case with his concession that he cannot prove traditional recoupment, that is, "recoupment" as it has been defined by the Supreme Court.

Martello readily concedes that this case is factually unique among predatory pricing cases. *He concedes that the recoupment which he can prove,* while no less valid, *is in one respect different from the recoupment discussed in the existing case law.* In the typical predatory pricing case, the defendant predator charges a group of consumers a below-cost price, drives competitors out of the market, and then collects a monopoly price from the same set of consumers against whom he was formerly predating. When these monopoly profits outweigh the losses he incurred during the predation, recoupment has occurred. To apply that typical recoupment to the facts of this case, EDS is zero pricing the

doctors: absent other facts here, recoupment would occur once EDS drove the competition (Martello and other clearinghouses) out of the market and then charged a monopoly price to the doctors. *Martello concedes that has not occurred here.*

(Emphasis supplied).

### Judge Fader's Opinion

In granting summary judgment in favor of Blue Cross and EDS, Judge Fader issued an extensive and thorough Memorandum Opinion and Judgment. After analyzing and discussing both federal and state antitrust law, he concluded that Martello's case was fatally flawed because of its inability to prove recoupment in its traditional and legally accepted sense.

Now said a number of different ways in this opinion, *proof of recoupment is an absolute necessity to maintain Martello's cause of action and the proof cannot be supplied in this case.* Therefore, the cause of action for antitrust violation must fail.

(Emphasis supplied).

### Our Rejection, Then and Now, Of an Alternative Recoupment Theory

Martello's three remaining appellate contentions all swirl about the subject of recoupment. One of those contentions is that Judge Fader erroneously rejected Martello's alternative recoupment theory. According to that theory, EDS 1) engaged in below-cost predatory pricing when it charged health care providers nothing for transmitting their claims to Blue Cross, 2)thereby sustained at least a theoretical loss, but 3) immediately recouped that loss by virtue of the supracompetitive 65¢ per claim payments it was receiving from Blue Cross.

We thought we had rejected any such alternative and nontraditional theory of recoupment in *Martello I* when we held:

[W]e do not accept appellant's suggestion of simultaneous recoupment by EDS upon receipt of monies from [Blue Cross] as sufficient to satisfy the recoupment component.

Slip opinion at p. 60.

 Martello adroitly attempts to dodge the foreclosing effect of what was intended to be the law of the case, however, by pointing out that in *Martello I* we referred to "simultaneous recoupment" and that he has since amended his alternative recoupment theory to include "future" 65¢ per claim payments by Blue Cross as well as "simultaneous" payments. Martello is engaging in a precious parsing of our words in *Martello I* so as to drain what we there said of a large measure of its intended meaning. With the adjective "simultaneous" we were roughly describing the alternative and non-traditional theory we were rejecting. We were not limiting the scope of the rejection.

We did not intend to make a fine distinction between 1) a "simultaneous" recoupment alternative theory, which we there rejected; and 2) a "future" recoupment alternative theory, which remained viable for future consideration. If the payments made to EDS by Blue Cross, by virtue of a preexisting contract and not by virtue of EDS's monopoly power over Blue Cross, did not qualify as recoupment in the present tense, neither would they qualify in the future tense.

We were rejecting any alternative theory of recoupment that did not fit the characteristics of recoupment regularly and invariably spelled out by the Supreme Court. We were rejecting any effort to look at "recoupment" out of its traditional antitrust context. We were rejecting any examination of "recoupment" in a vacuum rather than as simply one aspect of a larger and indivisible process that necessarily includes 1) predatory below-cost pricing resulting in a calculated loss by the predator, 2) the creation thereby of a "dangerous probability" that a monopoly will result as all or most competitors are driven from the field, and 3) recoupment of the predator's financial investment by sustained supracompetitive prices that

the consumers are forced to pay because of the predator's monopoly power over the market.

In case our inadvertent use of the adjective "simultaneous" left that intended meaning less than clear in *Martello I*, we hereby make it unequivocally clear in *Martello II*. It is our intention to dispose of this case once and for all and to leave no "wiggle room."

### The Motion to Dismiss Versus the Motion for Summary Judgment

Martello, however, is dogged in continuing to wiggle. In his second remaining contention he claims that a failure to offer proof of the expectation of recoupment, even if fatal to his third count charging a conspiracy to monopolize in violation of Sect. 11–204(a)(2), would not be similarly fatal to his second count charging a conspiracy to restrain trade in violation of Sect. 11–204(a)(1). He claims that our holding in *Martello I* with respect to the second count established as the law of the case that the expectation of recoupment is not a required element under that count. He contends, therefore, that Judge Fader, in granting summary judgment, "simply ignored the law of the case."

What was before us in *Martello I*, however, was the granting of a motion to dismiss. What is before us now, by contrast, is the granting of summary judgment. The two are not the same. In holding in *Martello I* that the second count survived the motion to dismiss, we were concerned only with the facial adequacy of the pleading. We there held:

> We reiterate that, for purposes of a motion to dismiss, we must assume the truth of Martello's allegations. We are satisfied that appellant sufficiently pleaded a claim for restraint of trade, because he alleged, *inter alia,* that appellees acted in concert in forming an agreement to eliminate competition in the electronic claims market in which Martello competes. Whether Martello will prove what he alleges is altogether another question, for another day.

*Martello I,* p. 43 of slip opinion. That is the law of the case and we do not gainsay it.

What is before us now, by contrast, is the granting of a motion for summary judgment. In *Melbourne v. Griffith,* 263 Md. 486, 491, 283 A.2d 363 (1971), the Court of Appeals described the burden that is cast on the party resisting a motion for summary judgment.

Where, as here, the pleadings, the depositions, and the affidavits submitted by the moving party set forth sufficient competent evidence to entitle him to summary judgment, *it is incumbent upon the opposing party to present such evidence as will give rise to a triable issue of fact in order to prevent the entry of summary judgment.*

(Emphasis supplied). See also *Seaboard Surety v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992).

As of the hearing on the motion for summary judgment, it had become clear that the only conspiracy to restrain trade that Martello could hope to prove was a conspiracy between Blue Cross and EDS to engage in predatory pricing and thereby to create a monopoly for EDS of the electronic connectivity provider market. In the context of this case, Martello's second count conspiracy and his third count conspiracy have become one and the same. If, therefore, the expectation of recoupment was a required element of the conspiracy to monopolize, it was *ipso facto* a required element of the particular conspiracy to restrain trade that was before the court in this case. Our attention will now turn, finally, to whether the expectation of recoupment was a required element of the conspiracy to monopolize.

### The Conspiracy to Monopolize

As his last-ditch contention, Martello maintains that even if Judge Fader erred in nothing else, he erroneously granted summary judgment on that part of Martello's third count charging a conspiracy to monopolize. Judge Fader ruled that the lack of any reasonable expectation of recoupment was fatal to that count, just as it was fatal to all other counts. Martello

counters that it is the law of the case, squarely held by *Martello I,* that the expectation of recoupment is not a required element of conspiracy to monopolize.

Martello misreads what we said in our earlier opinion. We were there reviewing the grant of a motion to dismiss. We were, therefore, concerned only with the facial adequacy of the pleadings. We acknowledged the abstract possibility that Martello might attempt to prove a conspiracy to monopolize by some modality other than a conspiracy to engage in predatory pricing. Accordingly, we held that he was free to come back and fight another day—if the fight was going to be in such an alternative arena.

Appellant also lodged a claim for conspiracy to monopolize against [Blue Cross] and EDS. *His contentions in this regard are not limited solely to a conspiracy to engage in a predatory pricing scheme.* In reviewing the court's decision to grant a motion to dismiss, we are not concerned with whether the conspiracy is likely to succeed in enabling EDS to achieve a monopoly in the electronic connectivity market. We focus on allegations of a "conscious commitment to a common scheme designed to achieve an unlawful objective."

. . . In our view, *Martello did not have to allege recoupment as part of the claim for conspiracy to monopolize.* Thus, we conclude that count three of Martello's amended complaint stated a claim for conspiracy to monopolize.

*Martello I,* pp. 61–62 of slip opinion (emphasis supplied).

Impunity from a motion to dismiss, however, is not *ipso facto* impunity from summary judgment. As of the time of the hearing on summary judgment it had become clear that the precise conspiracy Martello was hoping to prove was a conspiracy to engage in predatory pricing. Although the lack of recoupment might not be fatal to all conspiracies to monopolize, it was fatal to the particular conspiracy being urged by Martello.

Once the focus was narrowed to a conspiracy to engage in predatory pricing, everything we said in *Martello I* about the attempt to monopolize by engaging in predatory pricing was

equally pertinent to a conspiracy to monopolize by engaging in predatory pricing. We noted in *Martello I* that the third count was based on predatory pricing.

> The parties seem to agree that the third count embodies a claim based on predatory pricing.

Slip opinion at p. 47. Once the predicate modality of the conspiracy was established as predatory pricing, we made it clear that recoupment is, indeed, a required element.

> We are amply satisfied that *recoupment is,* indeed, *an element of a predatory pricing claim,* and that it was not sufficiently pleaded in the amended complaint....
>
> ... *[P]redatory pricing requires* 1) pricing below an appropriate measure of cost and 2) *a likelihood of subsequent recoupment of the investment by means of post-predation, supracompetitive prices and profits.* In essence, this means that once the predator has succeeded in eliminating competition, it recovers its earlier losses by raising prices.

Slip opinion at p. 49 (emphasis supplied).

 Whether endeavoring to prove consummated predation, attempted predation, or conspiracy to engage in predation, an indispensable element of the proof is recoupment.

> *[A] predation strategy* involving below-cost prices *requires recoupment* from monopoly or oligopoly prices that are sufficiently high and of sufficient duration so as to justify the earlier below-cost investment.

*Martello I,* p. 50 of slip opinion (emphasis supplied).

We established as the law of the case that recoupment is a required element of any predation scheme.

> *[W]e fail to see why appellant would not have to plead and establish recoupment. We hold that Martello was required adequately to allege recoupment.*
>
> ... *[H]e did not aver recoupment* either by EDS or [Blue Cross]. Moreover, *we do not accept appellant's suggestion of simultaneous recoupment* by EDS upon receipt of monies from [Blue Cross] as sufficient to satisfy the recoupment component. Accordingly, Martello's failure to allege

recoupment justified the court's dismissal of the monopoly and attempted monopoly claims.

*Martello I,* p. 60 of slip opinion (emphasis supplied).

It is, of course, the recoupment of the earlier losses by subsequent supracompetitive pricing that works harm on the competitive process. It was after *Martello I* was decided that the Supreme Court handed down its decision in *NYNEX Corporation v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). The Court was there dealing, *inter alia,* with a conspiracy to monopolize in violation of Sect. 2 of the Sherman Antitrust Act, a conspiracy like that charged in Martello's third count in violation of Sect. 11–204(a)(2) of the Maryland Antitrust Act. What the Supreme Court there said about harm to the competitive process as a required element could easily have been rephrased in terms of recoupment as a required element.

> The Court of Appeals also upheld the complaint's charge of a conspiracy to monopolize in violation of § 2 of the Sherman Act. It did so, however, on the understanding that the conspiracy in question consisted of the very same purchasing practices that we have previously discussed. *Unless those agreements harmed the competitive process, they did not amount to a conspiracy to monopolize.*

525 U.S. at 139, 119 S.Ct. 493 (emphasis supplied).

The opinion of the federal district court on remand in *Discon, Inc. v. Nynex Corporation,* 86 F.Supp.2d 154, 157 (W.D.N.Y.2000), summarized the Supreme Court's holding.

> [T]he Supreme Court held that ... Discon cannot succeed on its § 1 claim unless it alleges and proves that NYNEX's action caused harm, not just to Discon itself, but to competition as a whole in the relevant market. *The Court held that this requirement to allege and prove market-wide anticompetitive effects applied to both the § 1 and § 2 conspiracy claims.*

(Emphasis supplied).

*Carter v. Variflex,* 101 F.Supp.2d 1261 (C.D.Calif.2000), was also a case dealing with a conspiracy to monopolize. The

opinion of the district court focused on market power, another aspect of the dangerous probability of a monopoly that we have been discussing.

> *To prove a Section 2 claim for conspiracy to monopolize, a plaintiff must establish* the existence of a conspiracy, *the relevant market that the defendants intend to monopolize,* specific intent to monopolize, overt acts manifesting such intent, *and a meaningful threat to competition within the market from the defendants' behavior.* Variflex argues that proof of a relevant market or market power is not required to establish a conspiracy to monopolize. The Supreme Court has held otherwise. "Intent alone is not sufficient, however; *the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one.*" Thus, in light of the Court's findings regarding relevant market and market power, the Court finds that *Variflex has failed to plead sufficient evidence to establish a Section 2 conspiracy to monopolize the market.*

101 F.Supp.2d at 1268 (emphasis supplied).

\* \* \*

We hereby affirm Judge Fader's granting of summary judgment in favor of Blue Cross and EDS on all counts.

### The Road Not Taken

One comes to the inescapable conclusion that what Martello is really aggrieved at was the 1993 "exclusive dealing arrangement" between Blue Cross and EDS. One brief exchange in his deposition of November 13, 1995, lends support to that conclusion.

Q. Mr. Martello, am I correct that the essence of your complaint here is that Blue Cross & Blue Shield of Mary- land has given a more favorable arrangement to EDS than they are willing to give to you; is that accurate?

A. Yes.

Whatever else may be said about an exclusive dealing arrangement, it is not an antitrust violation. It is, moreover, not an issue before us on this appeal.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**