BERLYN, INC., et al., Plaintiffs,

v.

The GAZETTE NEWSPAPERS, et al., Defendants.

No. 01–CV–606.

United States District Court, D. Maryland.

Aug. 16, 2002.

George W. Liebmann, Law Office, Melvin J. Sykes, Law Office of Melvin J. Sykes, Baltimore, MD, for Plaintiffs.

Charles O. Monk, II, Daniel R. Chemers, Gretchen L. Klebasko, Saul Ewing LLP, Baltimore, MD, William J. Kolasky, Alice M. Stoeppelwerth, Fiona W. Huang, Kykle M. DeYoung, Washington, DC, David P. Donovan, Wilmer Cutler and Pickering, Tysons Corner, VA, for Defendants.

### MEMORANDUM OPINION

SMALKIN, Chief Judge.

The plaintiffs in this case filed a nine-count complaint, alleging violations of the Sherman Act, the Clayton Act, the Copyright Act, and the Maryland Antitrust Act, and state law claims for unfair competition, breach of contract, and tortious interference with contract. The case is now before the Court on three separate motions. The defendants have moved to exclude the testimony of James B. Shaffer, arguing that he is not qualified to offer opinion testimony relevant to this case. That motion has been dealt with in a separate Memorandum Opinion and Order dated August 13, 2002, which excludes Shaffer's opinions as to relevant market and market power. The defendants also have moved for summary judgment on all of the remaining counts of the complaint.[1] The plaintiffs have opposed that motion, and they have moved for preliminary injunctive relief. All issues have been fully briefed, and no oral hearing is necessary. Local Rule 105.6 (D.Md.2002). For the reasons set forth below, by separate order, the Court will GRANT the defendants' motion for summary judgment, and DENY AS MOOT the plaintiffs' motion for preliminary injunctive relief.

### I. BACKGROUND

#### A. Press Network and the Sale of Advertising in Prince George's County

The plaintiffs in this case are Berlyn, Inc. (Berlyn), Montgomery Sentinel Publishing, Inc. (Sentinel), and Kenneth C. Rossignol (Rossignol). Berlyn is wholly owned by Lynn Kapiloff (Kapiloff) and her husband. Kapiloff also has served as the CEO and primary manager of Sentinel's newspapers in Montgomery and Prince George's Counties (the *Montgomery County Sentinel* and the *Prince George's Sentinel*) since December, 1987. Rossignol publishes *St. Mary's Today*, a weekly paid newspaper published in Lexington Park,

---

1. Some counts of the plaintiffs' original complaint have already been dismissed. *See Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F.Supp.2d 609 (D.Md.2001).

Maryland, which has a circulation of approximately 5,000, with most subscribers and advertisers located in St. Mary's County, Maryland.

The Washington Post Company (the Post) is a publicly-held Delaware corporation. One of its operating units publishes the *Washington Post* newspaper. The Post owns all the stock of The Gazette Newspapers, Inc. ("Gazette"), but requires that Gazette operate as an independent concern.[2] Gazette is a Maryland corporation that publishes approximately 44 newspapers in Montgomery, Frederick, Prince George's, Calvert, Charles, and St. Mary's counties.

Baltimore Suburban Press Network, Inc. (Press Network or the Network), is a Delaware corporation, fifty percent of which is owned by Gazette. Press Network offers regional and national advertisers a "one contact/one bill" method of placing advertising in multiple newspapers around Washington, D.C.

Berlyn began publishing the *Montgomery County* and *Prince George's Sentinels* in the late 1980s, at which time both were small, paid-circulation papers. By 1992, Kapiloff had added free, county-wide papers in both counties based upon the advice of her advertising director, who believed advertisers would be attracted to the larger circulation of the free editions.

In 1992, Gaynelle Nuttall (Nuttall) was in the process of organizing Press Network. Nuttall invited several newspapers, including the *Prince George's Sentinel*, to become members of Press Network. She also sought to include strong community newspapers in the Washington suburbs, including Montgomery County, where she invited Gazette to become a member. At this time, Nuttall believed that the *Prince George's Sentinel* did not have the same level of circulation, penetration, and editorial quality as other Network members, but she hoped the paper would improve over time. According to the plaintiffs, Press Network contacted Kapiloff and invited the Sentinel to become a member of the Network. The plaintiffs allege that Nuttall represented that Sentinel would be Press Network's only representative paper in Prince George's County and that she reiterated this assurance in November 1997 and April 1998. According to the plaintiffs, Press Network forbade Sentinel from directly dealing with advertisers procured by Press Network or advertisers Sentinel had served before joining Press Network. There was no written contract to this effect. The plaintiffs allege that their "agreement" prevented Berlyn from sustaining contracts with major accounts like Fashion Bug and Kay Bee Toys and caused the resignation of Sentinel sales representatives.

Nuttall testified that by 1995 the *Sentinel* had not improved as she hoped, and that she had lost confidence in the paper's ability to measure up to the other publications included in the Network. Nuttall was concerned about the *Sentinel's* condition because she felt that a weak member could hurt the reputation of the entire Network. She came to believe that the Network would be best served by the addition of another member in Prince George's County, and she began to speak to other publishers about expanding into the Coun-

**2.** The plaintiffs argue that the Post exercises substantial control over Gazette, and that, in essence, the two function as one. The plaintiffs note that: (1) Gazette expenditures require the Post's approval; (2) Gazette's acquisitions were studied, strategized, negotiated, and funded by the Post; (3) Gazette regularly reported to the Post; (4) Gazette's CEO and CFO received their paychecks from the "Washington Post Newsweek Tech Media"; and (5) they had mutual interests in acquisitions of the assets of companies such as Comprint and the Chesapeake Publishing Company.

ty, including Chuck Lyons (Lyons), president of Gazette. At that time, none of the publishers she contacted was interested.

By 1997, Gazette had performed well in Montgomery County and had reached profitability in Frederick County. Around this time, Lyons became interested in possibly expanding into Prince George's County. Gazette formed a task force to examine the potential profitability of community-specific weekly newspapers in the County. In so doing, the task force interviewed potential advertisers, reviewed the demographics of the communities in the county, compiled research and market information regarding potential competitors, and created comprehensive pro formas evaluating the financial aspects of Gazette's entry. Gazette considered potential revenues from several sources, including Press Network accounts. Gazette's pro formas focused on local advertising, which, according to Gazette, is the primary type of advertising that sustains the "community-specific" model that Gazette had used with success in Montgomery County. According to the defendants, Gazette concluded that its most direct competition for advertising in the Prince George's County would be direct mail and shoppers, and that the *Prince George's Sentinel* was a weak product and was not considered a competitive factor.

Following its research, Gazette decided to enter Prince George's County with one or two community-specific publications, and planned to launch additional publications only after its first two became successful. In October 1997, Gazette's made its first entry, The *Greenbelt/College Park Gazette*. That publication became profitable in 1998, and Gazette began additional publications in other Prince George's County communities during the following three years.

According to the defendants, Gazette's new publications in Prince George's County were fast outperforming the *Prince George's Sentinel,* and Nuttall knew of Gazette's reliability first-hand because Gazette had been the Network's representative in Montgomery County for years. Nuttall also testified on deposition that she believed Gazette could provide a superior product to advertisers, and therefore could generate higher revenues for Press Network. Press Network began presenting advertisers with both the *Prince George's Sentinel* and the *Prince George's Gazette* in late 1997 and included Gazette publications on its March 1, 1998 rate card. When asked to provide a recommendation, Press Network salespersons recommended Gazette's publications. According to the defendants, advertisers preferred these publications for their superior circulation, penetration, reliability, editorial quality, and overall advertising value.

The plaintiffs offer a different account of Gazette's entry into Prince George's County. The plaintiffs argue that Gazette and Press Network conspired to eliminate competition in Prince George's County, first by orchestrating Gazette's entry into the county. The plaintiffs argue that Press Network was conceived, and indeed operated, as Gazette's "corporate sales arm" to the detriment of other Network members. Plaintiffs also argue that Press Network's sales reps pressured advertisers to choose Gazette over the Sentinel, and that Press Network and Gazette conspired to give Gazette preferred treatment on the rate cards the Network provided to advertisers.

B. *The Chesapeake Acquisition*

*St. Mary's Today* began operating in St. Mary's County in 1990. During the years 1997 through 2000, the only years for which financial data are available, the newspaper's annual profits ranged from a low of $1,157 to a high of $16,138. These profits constituted the entire compensation that Rossignol took from the business, de-

spite working more than 80 hours per week as a copywriter, delivery person, and general "one man band."

The Post first learned in October 2000 that the Chesapeake Publishing Company (Chesapeake) was for sale. Lyons, who had been president of Chesapeake from 1993 to 1998, was informed of this development and indicated Gazette's interest in acquiring Chesapeake's Southern Maryland Division. According to the defendants, Lyons believed that Chesapeake's Southern Maryland assets would compliment Gazette's existing operations, and that those assets likely would provide a solid return on investment if they could be acquired at a reasonable price.

The Post submitted a non-binding offer of $40 million to $50 million on November 1, 2000. The Post was invited to submit a binding indication of interest, and it did so on December 15, 2001. The Post believed its bid (in the range of $46 million to $48 million) was so low that it had little likelihood of being accepted. The bid was accepted, however, and Gazette purchased the Division on February 28, 2002, for $46 million, with funds loaned by the Post and booked to Gazette as an intercompany payable.

The plaintiffs argue that this acquisition adversely affected (or had the potential to so affect) competition in southern Maryland, including Montgomery, Prince George's and St. Mary's Counties. The plaintiffs allege that following this acquisition, the Post and Gazette had a 99% market share in the three counties. Essentially, the plaintiffs argue that this acquisition was an intentional step toward eliminating a major competitor (Chesapeake) and seizing monopoly power.

## II. *THE STANDARD FOR SUMMARY JUDGMENT*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth evidence upon which a reasonable factfinder could rely. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. *DISCUSSION*

### A. *Relevant Market*

#### 1. Product Market

In each of their antitrust claims, the plaintiffs bear the burden of proving relevant market. *Satellite Television & Assoc. Res., Inc. v. Cont'l Cablevision of Va.*,

*Inc.*, 714 F.2d 351, 355 (4th Cir.1983). Thus, this is essential to the success of any claim of conspiracy under Section 1 of the Sherman Act, *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir.1989); attempted monopolization under Section 2 of the Sherman Act, *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *M & M Med. Supplies & Serv. Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992); unlawful acquisition under the Clayton Act, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); and any violation of the Maryland Antitrust Act, *see Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53–56, 485 A.2d 663 (1984) (explaining that subsections (a)(1) and (a)(2) of the Maryland Antitrust Act are substantially similar to Sections 1 and 2 of the Sherman Act, and that courts' analysis of the former should be guided by federal decisions under the latter); *Martello v. Blue Cross & Blue Shield of Md., Inc.*, 143 Md.App. 462, 494, 795 A.2d 185 (2002) ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market.").

■ The relevant market has both a product and a geographic dimension, each of which is defined by its outer boundaries. The Supreme Court has explained that the outer boundaries of a product market can be proven through a showing of either of two market characteristics. First, a plaintiff may offer evidence of reasonable interchangeability of use, *i.e.*, evidence that the products contained in the market are interchangeable for the consumer's purposes. *See du Pont*, 351 U.S. at 395, 76 S.Ct. 994. Second, a plaintiff may offer evidence of cross-elasticity of demand, *i.e.*, "the responsiveness of the sales of one product to price changes of the other." *Id.* at 400, 76 S.Ct. 994. "Under either

test, the key issue is whether and under what conditions consumers would substitute one product for another." 2 JULIAN O. VON KALINOWSKI, ET AL., ANTITRUST LAWS AND TRADE REGULATION § 24.02 (2d ed.2002). The relevant geographic market, on the other hand, is "the area in which buyers or sellers of the relevant product effectively compete." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986). "The important economic factors that delimit the boundaries of the geographic market or submarket include transportation costs, actual sales, localized demand, industry recognition, and price relationships." VON KALINOWSKI, *supra*, at § 24.03[2]. In sum, then, a relevant market " 'is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.' " *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 430 (4th Cir.1986) (quoting L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST § 12, at 41 (1977)).

■ The plaintiffs contend that the relevant product market consists of community newspapers and the zoned edition of dailies. Plaintiffs further contend that the geographic market is defined by county, and thus, for its Sherman Act claims, the geographic markets are Prince George's and Montgomery County, and for its Clayton Act claim the geographic market is "the areas comprising" Prince George's and Montgomery Counties and "the southern Maryland counties of Charles, St. Mary's and Calvert." Pls.'s Opp. at 26. The defendants argue that this market definition is not supported by the evidence, and, in any case, that the relevant product market should include shoppers and direct mail.

■ Because they bear the burden of proving relevant market, to survive sum-

mary judgment on their antitrust claims, the plaintiffs must offer admissible evidence sufficient for a jury to find that the proposed relevant markets are accurate. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. Defining markets for antitrust analysis is an extremely complex task. *See, e.g., Cogan v. Harford Memorial Hosp.*, 843 F.Supp. 1013, 1020 (D.Md.1994) (characterizing the issue of relevant geographic market as a "highly technical economic question"); *Victus, Ltd. v. Collezione Europa U.S.A., Inc.*, 26 F.Supp.2d 772, 786 (M.D.N.C.1998) (noting that defining relevant product markets is a "difficult economic question"). Relevant market cannot be proved through generalizations about any given industry, but instead must be based on the economic and commercial realities of the particular market studied. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Brown Shoe Co. v. United States*, 370 U.S. 294, 335, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Thus, to prove relevant market, expert testimony is of utmost importance, and that testimony, or any other evidence, must be based on specific facts pertaining to the proposed market.[3] The plaintiffs' proposed expert in this case, James B. Shaffer, is not qualified to offer his opinion as to the relevant product or geographic markets, nor is he qualified to testify as to market power. *See* Memorandum Opinion and Order dated August 13, 2002. Thus, plaintiffs bear the difficult, if not impossible, burden of proving the outer boundaries of a relevant market and market power without the aid of an economic expert. Apart from Shaffer's testimony, the plaintiffs argue that other evidence supports their market definitions. The documents cited by the plaintiffs, however, are insufficient to support their proposed market definitions, as they are either inadmissible or irrelevant.

To demonstrate that the relevant product market excludes direct mail, shoppers, and any form of electronic broadcast media, the plaintiffs first cite a one-page Press Network document of unknown origin stating that "Washington Is a Print Town" and explaining that Washington area residents look to suburban newspapers for product advertising more so than other media sources. The plaintiffs, however, offer no evidence as to the source of this document, thus raising technical problems of admissibility under FED.R.EVID. 802 and 901, *see Wilson v. Clancy*, 747 F.Supp. 1154 (D.Md.1990), *aff'd* 940 F.2d 654 (4th Cir.1991), nor do they assert that this document is the result of a careful inquiry aimed at defining relevant markets for antitrust purposes. *See Va. Vermicu-*

---

**3.** It is unclear whether expert testimony, as a matter of law, is a necessary predicate to finding a market definition. Courts within this Circuit (and some outside) have indicated that a plaintiff must provide expert testimony on this issue. *See Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir.1987) (affirming summary judgment because, *inter alia*, the plaintiff's experts "were simply unable, when deposed, to provide any facts concerning injury to competition, nor could they adequately identify the relevant market"); *Cogan v. Harford Memorial Hosp.*, 843 F.Supp. 1013, 1020 (D.Md. 1994) ("To allow a jury to make a finding as to the geographic market, [the plaintiff] must provide the Court with expert testimony on this highly technical economic question."); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir.1985) ("Construction of a relevant economic market or a showing of monopoly power in that market cannot ... be based upon lay opinion testimony."). The Supreme Court has indicated otherwise. *See Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."). As a practical matter, however, it would seem impossible to prove such a complex economic question without the assistance of a qualified expert, *viz.*, an economist.

*lite, Ltd. v. W.R. Grace & Co.—Conn. & the Historic Green Springs, Inc.,* 98 F.Supp.2d 729, 732–33 (W.D.Va.2000).[4] Indeed, from all outward appearances, it was generated to attract advertisers to Press Network, and away from alternatives to newspaper advertising, including television, cable, radio, yellow pages and other forums for advertising.

The plaintiffs also cite two internal Post documents (WP003 & WP004). In short, these documents are irrelevant, as they are summaries of studies of metropolitan daily newspapers, and they do not focus specifically on the smaller product market proposed by the plaintiffs, *viz.,* community newspapers and zoned editions of dailies. Moreover, the plaintiffs again failed to identify how these documents were generated, whether the methods used were reliable, or whether the researchers sought to determine market boundaries as defined in antitrust law.

The plaintiffs also cite several cases and economic articles that recite factual findings as to the extent to which newspapers compete with other media sources for advertising revenues. These findings are also irrelevant. There is no evidence that any of these cases or articles dealt with a determination of the specific outer boundaries of the proposed markets in this case, and the plaintiffs cannot offer them as evidence of such. In short, these are exactly the type of generalized conclusions that must be rejected in favor of concrete data reflecting economic and commercial realities.

2. Geographic Market

■ The plaintiffs' evidence as to geographic market is similarly deficient. The plaintiffs again cite internal Post documents and deposition excerpts that do not directly speak to outer geographical boundaries and lines of competition for antitrust purposes. The Post documents are probative only in that they list business statistics by county. The deposition excerpts generally are statements of other non-experts as to what the geographical lines of competition are. There is no evidence, however, that the Post's internal documents or the opinions of its employees are based on specific research aimed at determining relevant market for antitrust purposes. In short, the plaintiffs have not undertaken an admissible, independent study of the proposed markets, and they therefore fail to offer admissible evidence as to the specific geographical lines of competition.

The plaintiffs have not offered sufficient evidence on the highly technical and fact-specific question of relevant market. Plaintiffs' arguments based on decisions from courts in other cases are unpersua-

---

4. The court in *Virginia Vermiculite* explained that the purpose behind an offered market study can be critical:

> Though related to a relevant market determination in an antitrust issue, there are differences between an analysis for business investment and an analysis for antitrust purposes. For one, market analyses performed for business usually provide information regarding the various places a product would be sold, uses for which it might be sold, and the regions in which it might be traded. These analyses do not go into the detail required for antitrust matters. For instance, defining where a product

> could be sold is only a small part of defining a geographic market as there can be relevant markets that are narrower or broader than where individual producers sell their products. In addition, market analyses for antitrust markets generally require some expertise in the field of industrial organization. Individuals with expertise in defining markets for [a given product] generally would not possess the skill and training of a professional economist necessary to define relevant market for antitrust purposes.

98 F.Supp.2d at 732–33.

sive, as those cases did not deal with the specific product or geographic markets involved in this case. Plaintiffs' reliance on studies conducted by the defendants is also misplaced, absent a showing that these studies dealt specifically with the markets alleged here or that they were aimed at defining relevant market for antitrust purposes. Due to the plaintiffs' failure to offer admissible evidence on which a jury could accept their definition of relevant market, each of the plaintiffs' antitrust claims (Counts I (Sherman Act § 1), II (Sherman Act § 2), III (Robinson–Patman Act); IV (Clayton Act § 7) and IX (respective sections of the Maryland Antitrust Act) of the amended complaint) fails as a matter of law. As discussed below, however, even if the plaintiffs were capable of proving relevant market, their antitrust claims suffer from other fatal defects.

### B. Amended Complaint Count I— Sherman Act Section 1

■ The plaintiffs contend that Gazette and Press Network conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[5] "To prove a violation of section one of the Sherman Act, a plaintiff must show the existence of an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 702 (4th Cir.1991). Under *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as interpreted in *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 924 F.2d 539, 542–43 (4th Cir.1991), to withstand summary judgment the plaintiffs must: (1)

establish that the defendants had a " 'conscious commitment to a common scheme designed to achieve an unlawful objective' " *id.* (quoting *Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464); and (2) bring forth evidence that excludes the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose. *Id.*

Specifically, the plaintiffs allege that, "at the instance of and pursuant to an agreement with the other defendants," Press Network "revised its rate card so as to group all of the Gazette's newspapers together and quote a combined rate for them, thus encouraging advertisers to seek blanket coverage in the entire Gazette network." Am.Compl. ¶ 23(d). Plaintiffs also argue that "at the instance of and pursuant to an agreement with the other defendants," Press Network allegedly "followed inconsistent practices in listing members on its rate cards, in order to benefit the Gazette newspapers." *Id.* ¶ 23(e). The plaintiffs also contend that, pursuant to the conspiracy, Gazette "abused their connection with Press Network by inducing [it] to agree to reduce the advertising obtained from such network by the *Sentinel* and other independent newspapers, so as to build up Gazette's market power by allocating to it advertising volume and revenues the independent papers had before the conspiracies ... were implemented." *Id.* ¶ 28(f).

#### 1. Concerted Action

■ As evidence that there was concerted action as to the rate cards, the plaintiffs offer a 1992 letter from Davis Kennedy, the previous owner of Gazette, to Gay Nuttall, insisting that one of the Gazette's newspapers, the *Burtonsville Gazette*, be

---

**5.** This Court has already found that "[t]he *Copperweld* doctrine makes clear that Post and Gazette are incapable of conspiring un-

der this statute." *Berlyn, Inc.*, 157 F.Supp.2d at 615.

the "primary buy" for advertisers using Press Network. Plaintiffs also offer a copy of an email between two Gazette employees which describes Press Network as the "corporate sales arm" of Gazette. Finally, the plaintiffs offer a rate card, designed by Nuttall but never actually used, which placed the Gazette's publications first and listed the Sentinel only as "also available."

As for the alleged agreement to switch accounts from Sentinel to Gazette and the supposedly orchestrated entry of Gazette into Prince George's County, the plaintiffs offer the following: (1) evidence that, prior to entering the county, Gazette anticipated that it would eventually receive substantial revenue from future Press Network accounts; (2) testimony from a former sales representative who indicated that Press Network's sales reps were told to actively encourage advertisers to switch their ads to Gazette publications; (3) further testimony that there was a general feeling among sales reps that they were to switch accounts from Sentinel to Gazette because Gazette was the parent company, and that they worked for the parent company and not Sentinel; (4) a memo from Daniel N. Butcher (Gazette's CFO) to Nuttall (Press Network's CEO) indicating that he knew that Press Network intended to move business from Sentinel to Gazette when Gazette became more successful; (5) other evidence indicating that Press Network and Gazette knew of each other's goals in Prince George's and Montgomery Counties and that there was a general willingness to achieve those goals.

The plaintiffs' evidence as to a rate card conspiracy is irrelevant and cannot support a finding of concerted action, as a matter of law. The Kennedy letter was written six years before the rate card update, by a person who was no longer a representative of Gazette when the update took place. Moreover, it had nothing to do with Senti-

nel or any of the other plaintiffs. The email between Gazette employees is similarly irrelevant. It contains no references to either Press Network's rate cards or the *Prince George's Sentinel*, it is dated three years after the rate card update, and it reflects a communication between two Gazette employees, NOT between employees of Gazette and Press Network. Finally, evidence that Nuttall designed a rate card that listed Sentinel in a disadvantaged position is not probative of concerted action because (1) there is no evidence of any cooperative effort in designing this card (Nuttall, as president of Press Network, designed a rate card for Press Network); and (2) the card was never used.

The plaintiffs' evidence as to a concerted effort to switch accounts from Sentinel to Gazette also fails to raise a triable issue. First, plaintiffs cannot support an inference that Gazette's entry into Prince George's County was the result of some common scheme. The record clearly indicates that Gazette entered the county at least one year after rejecting Press Network's initial inquiries. The evidence that Gazette considered possible future income from Press Network accounts is not sufficient to prove that Gazette's entry was a communal effort with the Network or that the projected revenue would come as a result of switching accounts from Sentinel to Gazette. Most importantly, the plaintiffs have failed to provide evidence that it would be contrary to Gazette's business purposes to attempt an entry into Prince George's County, especially in light of Gazette's success in other nearby counties.

As for Press Network's efforts to cause advertisers switch from Sentinel to Gazette, the plaintiffs similarly have failed to show that such a recommendation was not consistent with Press Network's business interests. The evidence indicates that Gazette's offerings in Prince George's County

had a higher circulation, deeper penetration, etc., and that Press Network viewed them as a superior product. Thus, it would be entirely consistent with Press Network's business purposes to recommend that their customers (advertisers) switch to a product more likely to reach their intended audience. The plaintiffs have failed to show that advertisers would not achieve better results by placing ads with Gazette.

As evidence that Press Network acted against its own interests, the plaintiffs point out that in 1997, Press Network's accounting department gave its owners, Gazette and Arundel, a 5% discount on commissions, resulting in a "loss" of $160,000. This evidence simply is not probative of whether Press Network's decision to recommend Gazette over Sentinel ran counter to the Network's independent interests.

For these reasons, the Court finds that there is no triable issue as to whether the defendants engaged in concerted action, as is necessary under Section 1 of the Sherman Act. In so finding, the Court is especially wary of permitting an inference of conspiracy where there is such a strong showing that the complained-of acts were wholly consistent with the independent business interests of each alleged co-conspirator. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 593, 106 S.Ct. 1348 ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." (citing *Monsanto,* 465 U.S. at 762–64, 104 S.Ct. 1464)).

2. Unreasonable Restraint on Trade

■ Even if plaintiffs could show that there was concerted action· in this case between Gazette and Press Network, as a matter of law they could not establish an unreasonable restraint on trade. It first should be noted that if this step were necessary, the Court would proceed under the standard "rule of reason" for determining whether a restraint on trade is reasonable. In proving that conduct is unreasonable under this standard, the plaintiffs would have to show that the alleged conspiracy adversely affected competition, which requires a showing that one or more of the defendants had market power. *Murrow Furniture Galleries, Inc.,* 889 F.2d at 528; *Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.,* 823 F.2d 829, 832 (4th Cir.1987). To prove market power, "the plaintiff first must establish the relevant product and geographic markets." *Murrow Furniture Galleries, Inc.,* 889 F.2d at 528 (citing *Satellite Television,* 714 F.2d at 355); *Military Servs. Realty,* 823 F.2d at 832. As discussed at length above, the plaintiffs have failed to define any relevant market, which obviously forecloses them from demonstrating any anticompetitive effects within a relevant market, or market power of a defendant. *Murrow,* 889 F.2d at 528.

■ The only way for the plaintiffs to prevail on the issue of unreasonable restraint, therefore, would be if the complained of conduct triggered *"per se"* analysis. As the Supreme Court has explained,

> there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.... Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements.

*N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)

(citations omitted). In determining whether conduct is *per se* unreasonable, the "inquiry must focus on whether the effect and ... purpose of the practice are to threaten the proper operation of our predominately free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)).

There is no *per se* unreasonable conduct here, and the plaintiffs' attempts to argue the existence of such conduct are extremely unconvincing. The plaintiffs argue that the defendants have engaged in market allocation. In so arguing, however, the plaintiffs essentially allege that there was an agreement not between Gazette and Press Network, but between Gazette and ArCom Publishing, Inc., which is not even a defendant in this case. This argument fails for obvious reasons. Moreover, on its face, the conduct complained of here (the allegedly orchestrated entry of Gazette into Prince George's County, or the alleged agreement between Gazette and Press Network to convince advertisers to move their ads into Gazette's papers) is not the type of conduct that would "always or almost always tend to restrict competition and decrease output." *Id.* Courts often recognize that the purpose of the antitrust laws is to protect consumers, not competitors. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" *Brooke*

*Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (quoting *Brown Shoe Co.*, 370 U.S. at 320, 82 S.Ct. 1502). There is nothing in the record that indicates that the consumers in this case (advertisers) were disadvantaged by the introduction of a newspaper with higher circulation and deeper penetration, or that such an introduction was of the type that would "always or almost always tend to restrict competition and decrease output." Quite the opposite. Thus, the standard rule of reason would apply to the plaintiffs' Section 1 claim, and that claim fails as a matter of law for the numerous reasons discussed above.

 Presumably as part of their Section 1 claim, the plaintiffs also now argue that Press Network illegally denied Rossignol and Sentinel access to an "essential facility," and in so doing opened itself to antitrust liability. The plaintiffs may not proceed on these grounds for a number of reasons. First, the theory of Press Network's liability for exclusion from an essential facility has not been properly put before the Court. It was not pleaded in the amended complaint, and it is well-settled that a plaintiff cannot amend his complaint with a later filed brief. The plaintiffs argue that the "qualities" that make Press Network an essential facility are stated in the complaint, but that argument is unpersuasive. The paragraphs cited by the plaintiffs relate to theories entirely separate from those needed to allege a claim under the essential facility doctrine, and they therefore fail to comply with FED.R.CIV.P. 8(a), which requires a statement of the claim showing that the pleader is entitled to relief.[6]

___

**6.** Plaintiffs' substantive argument that Press Network denied them access to an "essential facility" is found in their memoranda supporting preliminary injunctive relief. In arguing that their essential facility theory was

adequately stated in the amended complaint, the plaintiffs cite the amended complaint at paragraphs 12, 23(d) & (e), 28(f), 30(d), and 47–49. Paragraph 12 of the amended com-

Moreover, the plaintiffs have failed to produce evidence of elements required for establishing liability under this theory of law: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility to competitors. *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544 (4th Cir.1991); *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 151 (4th Cir.1990). In short, the plaintiffs' inability to establish the first element above is enough to highlight the inapplicability of the "essential facility" doctrine to this case. To establish "control by a monopolist," plaintiffs obviously must demonstrate that Press Network has monopoly power in a properly defined relevant market. *Consul, Ltd.*, 805 F.2d at 494–95. This Court previously found that "Press Network does not compete in the relevant market alleged by the plaintiffs in their complaint." *Berlyn, Inc.*, 157 F.Supp.2d at 620. Neither the plaintiffs nor their designated expert has made any attempt to define the relevant market in which Press Network competes or to show that it possesses market power, much less monopoly power. Finally, from the mere definition of the essential facility doctrine, it

is apparent that said doctrine is inapplicable to this case: to prevail, the plaintiff must show that the facility be denied to a "competitor"—a term that in no way describes any of the plaintiffs in this case.

Thus, for the several reasons stated above, it is clear that the plaintiffs' "essential facilities" argument cannot survive summary judgment.

### C. Amended Complaint Count II— Sherman Act Section 2

The plaintiffs next allege that the defendants, individually or in certain combinations, attempted and conspired to monopolize advertising in community weekly newspapers and the zoned editions of daily newspapers in Prince George's and Montgomery Counties, in violation of Section 2 of the Sherman Act.[7] From the outset, it is clear that the plaintiffs cannot proceed to trial on these claims, because a threshold requirement for liability under Section 2 is that the antitrust plaintiff must be able to prove a relevant market that the defendant attempted to monopolize. *Consul, Ltd.*, 805 F.2d at 493.

Even if plaintiffs could establish relevant market, to survive summary judgment on these claims, plaintiffs must provide evidence from which a reasonable jury could find the following: (1) that the defendants

---

plaint describes how Press Network came to be half owned by Gazette and states the circulation and revenue figures for papers involved in the Network. Paragraphs 23(d) and 23(e) consist of allegations that Press Network conspired with Gazette to restrain trade due to unlawful rate card practices, an allegation which has nothing to do with plaintiffs' theory that Press Network was an essential facility or that it deliberately excluded Rossignol and Sentinel. Paragraph 28(f) is similarly without reference to recovery on essential facility grounds. Paragraph 30(d) describes Sentinel's damages. Finally, paragraphs 47–49 relate to the plaintiffs' breach of contract cause of action.

7. Because a cause of action for conspiracy to monopolize requires a showing of concerted action, *see Advanced Health–Care Servs.*, 910 F.2d at 150, and because the plaintiffs have failed to show concerted action between Press Network and any other defendant, *see* Section III.B.1, *supra*, the plaintiffs cannot prevail on a conspiracy to monopolize theory as a matter of law. Also, as noted in this Court's August 2001 opinion, the *Copperweld* doctrine prevents a finding that Gazette and the Post are capable of conspiracy. Moreover, this Court previously held that Press Network could not be held liable for attempted monopolization, as it is not a competitor in the weekly newspaper market. *Berlyn, Inc.*, 157 F.Supp.2d at 620.

had a specific intent to monopolize a relevant market; (2) that the defendants engaged in predatory or anticompetitive acts designed to further their intent; and (3) that there is a dangerous probability that the defendants will succeed in their attempt. *Spectrum Sports, Inc.*, 506 U.S. at 456, 113 S.Ct. 884; *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir.1990). Also, to establish a willful attempt to acquire monopoly power, the plaintiffs must show " 'that a jury could find no valid business reason or concern for efficiency in the [defendants'] choice' " to act as it did. *Oksanen*, 945 F.2d at 710 (quoting *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir.1987)). The plaintiffs cannot establish these elements in either of their proposed markets, or as to either the Post or Gazette.

Absent direct evidence, an antitrust plaintiff may raise an inference of specific intent to monopolize (the first element of a Section 2 claim) by offering evidence of predatory or anticompetitive acts (the second element of a Section 2 claim). Thus, it makes logical sense to consider the plaintiffs' allegations of predatory conduct first. As discussed below, the plaintiffs' direct evidence of predatory pricing either is not relevant (as it does not relate to the markets alleged), or it is otherwise insufficient to raise an inference of specific intent in any of the proposed markets. Moreover, their attempt to satisfy the specific intent element through other circumstantial evidence, as well as their reliance on *Greenville Publishing Co. v. The Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir.1974), in doing so, is unavailing.

1. Weekly Newspapers / Zoned Editions of Dailies in Prince George's County

The plaintiffs allege that Gazette (and therefore the Post) attempted to monopolize this market. In opposition to summary judgment, as evidence of Gazette's intent to monopolize, the plaintiffs do not identify a specific pricing policy that they allege is predatory. Without direct evidence of suspicious pricing particular to Gazette in this market, the plaintiffs argue that other circumstances speak to the anticompetitive nature of Gazette's conduct and thus support an inference of monopolistic intent. The plaintiffs have offered evidence showing that: (1) the *Prince George's Gazette* projected and sustained losses in Prince George's County from 1998 through 2002; (2) during that time, the *Prince George's Gazette* was not "paying its own way," that is, it was funded by the Gazette as a whole, and thus by its larger owner, the Post; (3) during this time, the Gazette calculated the *Prince George's Gazette's* advertising price-to-cost ratio without factoring in numerous figures that, according to the plaintiffs, normally should be considered in calculating costs. The plaintiffs rely on *Greenville* for the proposition that where a plaintiff establishes that a business entity is losing money but not "paying its own way," there is a sufficient inference that the defendant's prices are designed to drive the plaintiff out of the market, and thus that the defendant has a specific intent to monopolize that market. The plaintiffs, however, have failed to identify any particular pricing policy that makes the *Prince George's Gazette's* losses suspicious. Moreover, *Greenville* is distinguishable on factual grounds. In *Greenville*, the defendant publishing company published a shopper, as a subsection to its larger publication. *Id.* at 393. The defendant offered advertisers a "combination advertising rate," which permitted advertisers who placed ads in the larger publication to rerun those ads in the shopper at half-price. *Id.* In light of this discount, the expert opinion of an accountant, evidence that the defendant introduced the shopper for the specific purpose of competing with the plaintiff,

and evidence that the defendant's shopper essentially was funded by the larger company, the Fourth Circuit found a sufficient inference of predatory pricing, and thus specific intent to monopolize. *Id.* at 398. Here, however, there is no evidence of questionable pricing policies. The plaintiffs have not, for example, identified Gazette's prices for advertising in Prince George's County and analyzed them with any specific cost accounting. Instead, the plaintiffs simply call attention to the fact that Gazette lost money in Prince George's County, and then cite language from *Greenville* stating that "[p]roof that [a defendant] is not paying its own way would support an inference that defendants' pricing policies were designed to drive [competitors] out of the market." *Id.* Simply losing money is not a "pricing policy."

Moreover, establishing predatory pricing requires a showing that the complained-of conduct lacked a business efficiency and that there was a likelihood of recoupment of losses (a requirement which did not exist at the time *Greenville* was decided, *see Brooke Group, Ltd.,* 509 U.S. at 222–26, 113 S.Ct. 2578). The defendants have shown that the *Prince George's Gazette* was run according to a previously successful business strategy, and there is no evidence that any particular conduct was without efficiency and instead was aimed at driving out competitors and monopolizing the Prince George's County market. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *White,* 820 at 105 (to show willfulness under Section 2, a plaintiff must show that a jury could find no valid business reasons or concern for efficiency in the defendants' allegedly anticompetitive act). In short, the plaintiffs have failed to estab-

lish a Section 2 claim in this proposed relevant market.

### 2. Community Weekly Newspapers and the Zoned Editions of Daily Newspapers in Montgomery County

The plaintiffs also allege that Gazette and the Post attempted to monopolize this market. As for Gazette, the plaintiffs allege that Gazette "targeted the Sentinel's Montgomery County legal advertising." Pls.' Opp. at 40. Plaintiffs also allege that Gazette's "charges per page for legal and directory advertising were less than $200.00 per page—equal to or less than its combined printing and editorial costs per page—while its charges for other advertising categories ranged up to $1,000 per page." However, the evidence cited to support these allegations is insufficient to raise an inference of predatory conduct. First, the plaintiffs cite a handful of Gazette documents showing only that: (1) in 1998, the Gazette as a whole (not limited to its Montgomery County publications) received about $200 per page (a very liberal reading of the graph, in the plaintiffs favor) in revenue from "Directories/Legals" advertising; (2) the average 1998 cost per page for printing the Gazette as a whole was around $85; (3) the average 1998 "editorial" cost per page was close to $100. Thus, based on these three cited graphs, the defendant priced an average of $15 *above* cost for legal advertising. Moreover, these documents represent the costs and revenues of Gazette as a whole, not just its Montgomery County publications. The plaintiffs cannot proceed to trial based on such evidence, as it clearly is inadequate to show specific intent, anticompetitive conduct, and/or dangerous probability of success.

The plaintiffs also argue that the Post is liable under Section 2. The plaintiffs claim that, in an attempt to drive the *Montgom-*

*ery Sentinel* out of the competitive pool, the Post reduced its legal advertising rates below those of Sentinel in March 1998 and accorded Montgomery County legal advertisers free advertising in Prince George's County. In support of this claim, the plaintiffs cite the deposition testimony of Rita Coopersmith, an advertising sales representative for the Post. Coopersmith states that between 1999 and 2001 the Post had recently acquired presses that would allow it to geographically zone the content of certain newspaper sections, including classifieds, at the county level. During these years, however, the Post was not yet able to implement the zoning process, but it offered advertisers the opportunity to take advantage of a zoned advertising rate. What this meant in practical terms was that an advertiser could pay a zoned rate, but their ad would be seen throughout the Post's entire circulation area. According to Coopersmith, legal advertisers benefitted from this practice beginning in 1999, until February 2000, when the presses were capable of producing zoned editions.

This evidence is insufficient to raise an inference of attempted monopolization. There is absolutely no evidence that this conduct was not carried out for independent and legitimate business reasons to promote advertising in the Post in general. There is certainly no evidence (other than the mere existence of the practice alone, and in combination with the plaintiffs' bare allegations of anticompetitive intent) to show that the practice was carried out specifically for anticompetitive purposes, or to eliminate any particular competitor or competition in general, in the relevant markets proposed by the plaintiffs.

Finally, in opposition to summary judgment, the plaintiffs attack the Post's cost calculations. The plaintiffs argue that in establishing "cost" for advertising pricing purposes, the Post takes only into account printing costs, and excludes substantial costs such as print labor, ink, composition labor, circulation costs, etc. In support of this, the plaintiffs cite the deposition of Stephen Hills, a vice president of sales and marketing for the Post. Hills testified that he receives rate proposals for advertising that indicate a cost calculation, to be taken into account when setting an advertising rate. According to Hill, as far as he knows, the cost figure is simply a representation of the printing cost alone (i.e., the newsprint paper). He also testified that he does not contribute to calculating those figures.

Based on this evidence, the plaintiffs wish to raise an inference of predatory pricing by the Post as to legal advertising in community newspapers in Montgomery County. As noted above, however, predatory pricing requires proof of predatory conduct (which raises an inference of intent), and likelihood of recoupment in that relevant market. The plaintiffs' citation to deposition testimony of Hills's personal concept of cost calculation for the Post in general is not sufficient to support a finding that the Post engaged in below-cost pricing for legal advertising in Montgomery County and that there was a dangerous probability that it could recoup its losses after the competition was eliminated. The plaintiffs also rely on evidence relating to the Post that does not concern the plaintiffs' proposed product or geographic markets. The documents the plaintiffs cite to show pricing below cost deal with the Post's full-run pricing as a metropolitan daily to customers for trustee advertising in areas such as Washington, D.C. This clearly falls outside of the plaintiffs' proposed relevant markets, *viz.*, community weekly newspapers and the zoned editions of daily newspapers. Moreover, there is no evidence in the record that if the Post were to obtain the plaintiffs' share of legal advertising they would have market or monopoly power over advertis-

ing in any market, let alone those proposed by the plaintiffs.

In sum, the plaintiffs have failed to establish a Section 2 case as to any defendant. Most obviously, plaintiffs' failure to offer admissible evidence as to the relevant markets prevents them from satisfying the first and third elements of a Section 2 claim, as described above. Moreover, the plaintiffs have not identified relevant predatory conduct sufficient to create a triable issue as to either defendant's liability under this statute.[8]

### D. Count III: Violations of the Robinson–Patman Act

In its August 2001 decision, this Court explained that "[b]y its terms, the [Robinson–Patman Act] is limited to price discrimination in the sale of commodities. The majority of courts to consider the issue have concluded that newspaper advertising is not a commodity under the statute.... Therefore, plaintiffs may not pursue their Robinson–Patman claim with respect to newspaper advertising, and may only pursue it to the extent that they allege price discrimination in the sale of newspapers themselves, as courts have held that newspapers *are* considered a commodity under the Act." *Berlyn, Inc.,* 157 F.Supp.2d at 621.

After discovery, the plaintiffs concede that their price discrimination claim relates to newspaper advertising, and that any remedy for plaintiffs on this count must come under Maryland law, which does not distinguish between "commodity" and "service" with regard to price differentials. *See* MD.CODE ANN., COM.LAW II § 11–204(a)(3) (2000). For these reasons, the defendants are entitled to judgment as a matter of law on Count III of the amended complaint. Plaintiffs' state law price discrimination claims will be discussed *infra,* Section III.I.

### E. Count IV: Section 7 of the Clayton Act—The Chesapeake Acquisition

The plaintiffs also allege that the Post and Gazette violated Section 7 of the Clayton Act, which prohibits acquisitions whose effect "may be substantially to lessen competition." 15 U.S.C. § 18 (1997). The

---

**8.** In arguing their Section 2 claims, the plaintiffs also discuss "hiring allegations" and "merger and expansion allegations," presumably as evidence of specific intent on the part of the defendants to monopolize the proposed markets. The plaintiffs apparently wish this Court to find that Gazette's hiring of certain Sentinel employees in 1999 speaks to a specific intent to monopolize or to eliminate competition in general. The plaintiffs, however, offer insufficient evidence that these hires were anything but legitimate. The plaintiffs' other "hiring allegations" are plainly irrelevant. First, the plaintiffs offer evidence that Press Network (not a proper Section 2 defendant) hired employees of the *Journal,* which is not a party to this case. Next, the plaintiffs offer evidence that the Post hired a *Washington Times* employee as a consultant concerning the market for legal advertising in the Washington, D.C. area.

As for the plaintiffs' "merger and expansion allegations," these are similarly irrelevant to the plaintiffs' Section 2 claims. In short, the plaintiffs point to evidence that, over the years, the Post has considered a number of acquisitions, some of which it consummated. Most of these acquisitions had little to do with the specific markets alleged here, and the company's mere desire to expand is insufficient to raise an inference of anticompetitive intent. Moreover, the plaintiffs have failed to identify evidence which indicates that each of these acquisitions (or decisions not to acquire) were inconsistent with the Post's rational business purposes. Plaintiffs also describe a variety of agreements between the Post or Gazette and third parties, including facially appropriate marketing agreements and covenants not to compete. The plaintiffs have failed to show how such agreements were against the defendants' rational business interests, and they cannot support an inference that Gazette or the Post intended to monopolize any of the proposed relevant markets.

plaintiffs assert that through acquisition of the Chesapeake Publishing Company's southern Maryland division, the defendants may substantially lessen competition in Prince George's County and southern Maryland. The defendants have challenged this claim on a number of grounds, arguing that the plaintiffs lack standing, and that there is no evidence of a substantial lessening of competition or of damages. These arguments need not be dealt with in full, as the plaintiffs' Clayton Act claim fails for the same primary reason as its flawed Sherman Act claims: inability to offer sufficient evidence of a relevant market within which to judge the defendants' conduct. "The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market." *Brown Shoe,* 370 U.S. at 343, 82 S.Ct. 1502; *see also United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (analysis of relevant market is the same under Section 7 and the Sherman Act). As discussed at length above, the plaintiffs have failed to produce sufficient evidence of relevant market, and, for that reason, they cannot proceed to trial on the merits of their Clayton Act claim.

### F. Count V: Unfair Competition

■ In opposition to the defendants' motion for summary judgment, the plaintiffs essentially argue that the conduct giving rise to their antitrust claims also supports a cause of action for unfair competition under Maryland law. More specifically, the plaintiffs claim that "[t]he use of Sentinel to build up revenue for Gazette is one of the many acts that qualify" as unfair competition under Maryland law. Pls.' Opp. at 59.

■ The majority of Maryland cases concerning unfair competition deal with allegations of trade confusion. *See, e.g., Mascaro v. Snelling & Snelling of Balt., Inc.,* 250 Md. 215, 243 A.2d 1 (1968); *Avalon Hill Co. v. Gebhardt,* 224 Md. 52, 166 A.2d 740 (1961); *Edmondson Vill. Theatre, Inc. v. Einbinder,* 208 Md. 38, 116 A.2d 377 (1955); *Balt. Bedding Corp. v. Moses,* 182 Md. 229, 34 A.2d 338 (1943); *Sea Watch Stores LLC v. Council of Unit Owners of Sea Watch Condo.,* 115 Md.App. 5, 691 A.2d 750 (1997). Maryland courts have defined unfair competition as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Balt. Bedding Co.,* 182 Md. at 237, 34 A.2d 338; *see also Trimed, Inc. v. Sherwood Med. Co.,* 977 F.2d 885, 891 (4th Cir.1992).

The defendants are entitled to judgment on this claim for two reasons. First, in its August 2001 opinion, the Court noted that " 'a violation of antitrust laws could itself constitute unfair competition,' and therefore, this count will not be dismissed so long as plaintiffs' antitrust claims remain viable." *Berlyn, Inc.,* 157 F.Supp.2d at 624 (quoting *Sun Dun, Inc. of Wash. v. Coca–Cola Co.,* 740 F.Supp. 381, 397 (D.Md.1990)). As discussed above, none of plaintiffs antitrust claims can prevail, which precludes any finding of liability on the ground that the defendants violated the antitrust laws.

Second, the plaintiffs have failed to substantiate any independent grounds for an unfair competition claim. The plaintiffs allege that the unfair practice here was collusion between Press Network and Gazette to build up advertising revenues for Sentinel in Prince George's County, only later to steal that business away and to assign it to Gazette upon its entry into Prince George's County. Above, the Court has found insufficient evidence of

concerted action between Gazette and Press Network, and plaintiffs' assertion that Sentinel was used by the two to guarantee business upon Gazette's entry is supported only by an unjustifiably liberal reading of two excerpts from Nuttall's deposition. Moreover, the plaintiffs have failed to show that the defendants' actions in this case were anticompetitive, or that each complained-of action was not taken with some independent and legitimate business purpose. This is not enough to proceed to trial on unfair competition grounds, especially in light of the Court's dismissal of all of the plaintiffs' antitrust claims, and the nearly exclusive historical application of this cause of action to trademark cases. Thus, the defendants are entitled to judgment as a matter of law on this count of the amended complaint.

## G. *Count VI: Breach of Contract*

█ The only contract the amended complaint claims has been breached is an alleged agency contract between Press Network and Berlyn. The plaintiffs assert that in 1993,

> Press Network, through Gay Nuttall, its chief executive officer, promised Berlyn ... that Press Network would function fairly as a faithful agent for Berlyn in consideration of the Sentinel's joining the Press Network as a member and adding its circulation to Press Network. Berlyn agreed to participate on these terms. As a result in substantial part of the P.G. County Sentinel's membership, Press Network attained a dominant position in P.G. County. Defendant Press Network, in breach of its contractual obligations to Plaintiffs, has allocated advertising so as to favor Gazette newspapers.

Amended Complaint ¶¶ 47–49.

█ Thus, the plaintiffs' breach of contract claim is premised on the existence of an unwritten agency agreement between Berlyn and Press Network. To prove the existence of an agency relationship in the absence of a written agreement, the plaintiffs must show conduct proving: "(1) the agent [was] subject to the principal's right of control, (2) the agent [had] a duty to act primarily for the benefit of the principal, and (3) the agent [held] the power to alter the legal relations of the principal." *Huntington Mort. Co. v. Mort. Power Fin. Servs., Inc.,* 90 F.Supp.2d 670, 674 (D.Md. 2000) (citing *United Capitol Ins. Co. v. Kapiloff,* 155 F.3d 488, 498 (4th Cir.1998); *Patten v. Bd. of Liquor License Comm'rs,* 107 Md.App. 224, 238, 667 A.2d 940 (1995)).

In opposition to the defendants' motion for summary judgment, the plaintiffs have failed to specifically identify the evidentiary basis for any of these elements. In their opposition, the plaintiffs simply identify the paragraph of their complaint that asserted breach of contract, and state that "the breach has been fully proved by the evidence recited above." Assuming that "the evidence recited above" includes the preceding fifty-nine pages of opposition, the only substantial discussion of the agreement between Kapiloff and Nuttall occurs in the plaintiffs' factual background section, which cites Kapiloff's deposition testimony to support the existence of an agreement. At best, the Kapiloff deposition shows that Nuttall orally agreed that the Sentinel would be "her paper" in Prince George's County, and that Press Network would "represent [Sentinel] for the corporate advertising." Kapiloff Dep. at 311–12. Kapiloff then agreed that those were all the terms of the contract, and that, although Nuttall never said so, Kapiloff assumed that this agreement would last "forever." *Id.* at 313–14, 667 A.2d 940. This clearly fails to establish any of the three elements of an agency agreement under Maryland law. Moreover, the plaintiffs' opposition is devoid of any substantive discussion or evidence that (1) Berlyn

had the right to control Press Network; (2) that Press Network agreed to act primarily for Berlyn's benefit; or (3) that Press Network had the authority to alter Berlyn's legal relations.[9]

In sum, the plaintiffs have failed to identify the elements of an agency contract, either through express agreement or implied through conduct. Under settled law, the party who would bear the burden of proof on an issue at trial bears the similar burden of producing admissible evidence on that issue at the summary judgment stage. *Celotex Corp.*, 477 U.S at 322, 106 S.Ct. 2548. The plaintiffs have failed to meet this burden, and the defendants therefore are entitled to judgment as to count VI of the amended complaint.

■■■ Finally, even if plaintiffs could establish a case for breach of contract based on Press Network's conduct upon Gazette's entry into Prince George's County, that cause of action would be time-barred. Under Maryland law, a cause of action for breach of contract must be filed within three years from the date that the cause of action accrues. MD.CODE ANN., CTS. & JUD.PROC. § 5–101 (1998). A breach of contract claim accrues when the contract is breached or anticipatorily breached. *The Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.*, 139 Md. App. 277, 297, 775 A.2d 458 (2001) (citing *Singer Co., Link Simulation Sys. Div. v. Balt. Gas & Elec. Co.*, 79 Md.App. 461, 473, 558 A.2d 419 (1989); *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 171, 527 A.2d 1316 (1987); *Yingling v. Phillips*, 65 Md.App. 451, 460, 501 A.2d 87 (1985)). In this case, the plaintiffs allege an agency contract, including, presumably, exclusivity of representation in Prince George's County. If such a contract existed, it would have been breached, at the latest, in the fall of 1997, when Gazette expanded into Prince George's County and Press Network began to facilitate the placing of ads in the *Prince George's Gazette*. Plaintiffs' cause of action for breach of contract is therefore time-barred, as the plaintiffs did not file a complaint until February 28, 2001.

For these several reasons, the defendants are entitled to judgment as a matter of law on the plaintiffs breach of contract claim.

### H. *Counts VII and VIII: Tortious Interference with Contract and with Business Relations*

■■■ The plaintiffs argue that the Post and Gazette interfered with whatever contractual relationship existed between Press Network and Berlyn. To prove tortious interference with contract in Maryland, the plaintiffs must prove "1) the existence of a contract between the plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional[ ] interference with that contract; and 4) resulting damages to the plaintiff." *Cogan*, 843 F.Supp. at 1021 (citing *Fowler v. Printers II, Inc.*, 89 Md.App. 448, 466, 598 A.2d 794 (1991)). Even if a plaintiff can establish these elements, "a competitor who induces a breach of [an at-will contract] to serve his own competitive purpose does not interfere improperly unless the competitor employs wrongful means or creates a restraint of trade." *Fowler*, 89 Md.App. at 468, 598 A.2d 794.

As discussed above, the plaintiffs have failed to establish the existence of an agency contract between Press Network and Berlyn. To the extent that there was *any*

---

9. Even if there were some evidence of any of these elements somewhere in the substantial record generated during discovery, it is the plaintiffs' affirmative burden to identify admissible evidence that warrants denial of a motion for summary judgment. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

contract between those parties, there is no evidence in the record showing that the agreement was anything other than terminable at will. Moreover, the plaintiffs have failed to show that Gazette's conduct in this case was inconsistent with its competitive purposes, and the discussion above illustrates that there was no independently wrongful conduct or a restraint on trade. The defendants, therefore, are entitled to judgment on this issue.

The plaintiffs also assert the broader tort of interference with economic advantage, stating that "Post and Gazette have tortiously interfered with Berlyn's economic relationship with Press Network, and all three defendants have discouraged and interfered with attempts by Berlyn to deal directly with advertisers, disparaged the *Sentinel's* quality to prospective customers, and tortiously weakened Berlyn's ability to sell advertising space to prospective customers." Am.Compl. ¶ 52. The plaintiffs' claims here fail for several reasons.

■■■ To prove a claim of tortious interference with a prospective economic relationship, the plaintiffs must show (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting. *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 652, 650 A.2d 260 (1994). The tort requires conduct "that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Id.* at 657, 650 A.2d 260. "Wrongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.' " *Id.* (quoting *K & K*

*Mgmt., Inc. v. Lee*, 316 Md. 137, 166, 557 A.2d 965 (1989)) (quoting PROSSER, LAW OF TORTS, § 130, 952–953 (4th ed.1971)).

■■■ The plaintiffs simply have failed to establish that each of these elements exists. In opposition to summary judgment, the plaintiffs essentially reassert their allegations of predatory conduct by the Post and Gazette, and identify several discounts that Gazette gave to Sentinel's advertisers. The plaintiffs fail to offer evidence to prove that these acts were calculated specifically to cause damage to the plaintiffs, or that they were done with unlawful purpose or without justifiable cause. As discussed in the antitrust context, the plaintiffs have failed to show that these acts were not pursuant to defendants' lawful business purposes. The plaintiffs cannot base tort liability simply on the ground that the Post or Gazette caused them incidental damage by attracting away certain advertisers. In short, the plaintiffs' general allegations of wrongdoing fail to satisfy the specific elements of a cause of action for tortious interference, and, for the above reasons, the defendants are entitled to judgment as a matter of law.

### I. *Count IX: Violations of the Maryland Antitrust Act*

■■■ The final count of the amended complaint asserts that the defendants are liable for numerous violations of the Maryland Antitrust Act, on the same grounds as their numerous federal antitrust claims. All of the plaintiffs' arguments for state law liability must be dismissed, for the same reasons their federal claims failed. The Maryland Antitrust Act substantially mirrors its federal counterparts, and the plaintiffs' failure to establish a case under federal law warrants dismissal under state law for the many reasons discussed above. *See Natural Design, Inc.*, 302 Md. at 53–56, 485 A.2d 663. This includes the plain-

tiffs' claim of price discrimination under MD.CODE ANN., COM.LAW II, 11–204(a)(3). That statute is *in pari materia* with the Robinson–Patman Act's prohibition of price discrimination, 15 U.S.C. § 13(a). To establish liability under the Robinson–Patman Act, as is the case with the other antitrust claims involved in this case, the plaintiffs bear the burden of proving a relevant market within which the consequences of the defendants' anticompetitive acts can be measured. *Brooke Group. Ltd.*, 509 U.S. at 222. The plaintiffs cannot prove a relevant market on the evidence now before the Court, and, for that reason, the plaintiffs' state law price discrimination claim fails as a matter of law.

## IV. *CONCLUSION*

For the reason stated above, by separate order, the Court will GRANT the defendants' motion for summary judgment and enter judgment in their favor. That order will also DENY AS MOOT the plaintiffs' motion for preliminary injunctive relief.

### *ORDER AND JUDGMENT*

For the reasons stated in the Memorandum Opinion issued on this day, it is this 16th day of August, 2002, ORDERED AND ADJUDGED:

1. That the defendants' motion for summary judgment BE, and it hereby IS, GRANTED;
2. That the plaintiffs' motion for preliminary injunctive relief BE, and it hereby IS, DENIED AS MOOT;
3. That judgment BE, and it hereby IS, ENTERED in favor of the defendants and against the plaintiffs;
4. That each party bear its own costs;
5. That this case BE, and it hereby IS, CLOSED; and
6. That the Clerk of the Court mail copies of this Order and Judgment

and Memorandum Opinion to counsel.